**Bruce SMITH, Appellant,**

v.

**Kathleen SMITH, Appellee.**

**No. 14–96–01080–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

June 29, 2000.

---

Shawn Russel Casey, Houston, for appellants.

Ginny S. Langenkamp, Michael Duncan, Lydia T. Protopapas, Houston, for appellees.

Panel consists of Chief Justice MURPHY and Justices HUDSON and Senior Justice LEE.*

## MAJORITY OPINION
## ON REHEARING

NORMAN LEE, Justice (Assigned).

We deny the motions for rehearing filed January 3, 2000 and January 18, 2000. We withdraw our opinion of December 2, 1999, and substitute the following.

This is an appeal from the property division in a divorce case. Bruce and Kathleen Smith were married on April 21, 1990. Two children were born during the marriage. The Smiths were separated on July 8, 1994, and soon thereafter Mrs. Smith petitioned for divorce. After a bench trial, the trial court entered the divorce decree, naming Mrs. Smith as the children's sole managing conservator and dividing the marital estate between the parties. The trial court filed findings of fact and conclusions of law. In five points of error, Mr. Smith complains the trial court erred in (1) awarding his separate property to Mrs. Smith, (2) characterizing some of the funds in Mrs. Smith's retirement plan as her separate property, and (3) refusing to allow the appellant to have advisory counsel present during the trial. We find the trial court committed reversible error by mischaracterizing Mr. Smith's separate property as community property and by divesting Mr. Smith of his separate property. We reverse and remand on the issue of the property division.

## STANDARD OF REVIEW

In his first four points of error, Mr. Smith complains the trial court erred in dividing the marital estate. The trial court has broad discretion in dividing the marital estate at divorce. *See Murff v. Murff,* 615 S.W.2d 696, 698 (Tex.1981). Upon appeal, we presume the trial court used its discretion and will reverse the cause only where the trial court clearly abused that discretion. *See id.* A clear abuse of discretion is shown only if the division of the property is manifestly unjust and unfair. *See id.; Hanson v. Hanson,* 672 S.W.2d 274, 277 (Tex.App.-Houston [14th Dist.] 1984, writ dism'd w.o.j.). We must remand the entire community estate for a new division when we find reversible error that materially affects the trial court's "just and right" division of the property. *See Jacobs v. Jacobs,* 687 S.W.2d 731, 732 (Tex.1985).

Appellant's first four points of error also challenge the legal and factual sufficiency of the evidence. When we review a challenge to the legal sufficiency of the evidence, we consider only the evidence and inferences tending to support the trial court's findings and disregard all evidence and inferences to the contrary. *See Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex. 1992). In reviewing the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if that judgment is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

We will review fact findings in a bench trial for legal and factual sufficiency of the evidence by the same standards used in reviewing the evidence supporting a jury's verdict. *See Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996). We review the trial

---

* Senior Justice Norman Lee sitting by assignment.

court's conclusions of law de novo as legal questions. *See Piazza v. City of Granger*, 909 S.W.2d 529, 532 (Tex.App.-Austin 1995, no writ). This court will follow a trial court's conclusion of law unless it is erroneous as a matter of law. *See id.*

## ATLANTIC FEDERAL CREDIT UNION ACCOUNT

■ In his first and second points of error, Mr. Smith argues that the trial court erred in characterizing funds in the parties' Atlantic Federal Credit Union ("AFCU") bank account as community property and awarding to Mrs. Smith about half of the funds, approximately $50,000. He contends that the evidence was legally and factually insufficient to support the trial court's finding that the funds remaining in the account were community property. We agree.

■ As a general rule, property possessed by either spouse during or on dissolution of marriage is presumed to be community property, and a spouse must present clear and convincing evidence to establish that such property is separate property. *See* TEX. FAM.CODE § 5.02.[1] Clear and convincing evidence is the degree of proof that will produce in the mind of the trier of fact a firm belief or conviction about the allegations sought to be established. *See* TEX. FAM.CODE § 11.15(c)[2]; *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex.1994). To overcome this presumption, the spouse claiming certain property as separate property must trace and clearly identify the property claimed to be separate. *See McElwee v. McElwee*, 911 S.W.2d 182, 189 (Tex.App.-Houston [1st Dist.] 1995, writ denied). Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property. *See Hilliard v. Hilliard*, 725 S.W.2d 722, 723 (Tex.App.-Dallas 1985, no writ).

The evidence cited from the record reveals that the funds in the AFCU account originated from damages awarded to Mr. Smith in a lawsuit he filed before his marriage to Mrs. Smith. The suit arose out of misrepresentations made to him during the purchase of a townhouse.[3] Although the misrepresentation suit was filed before the marriage, the trial, appeal, and ultimate recovery of damages took place during the marriage. As a result of the suit, Mr. Smith was awarded a gross amount of $256,248.91. Mr. Smith does not dispute that $81,940.41 of this gross recovery was pre- and postjudgment interest earned during the marriage and was, therefore, community property. *See* TEX. FAM.CODE § 5.01(b).[4] He contends that the remainder of the gross award, $174,308.50, and the funds remaining in the account at the dissolution of marriage, approximately $100,000, were part of his separate estate.

■ To support his claim, Mr. Smith relies upon the inception-of-title rule.

---

1. *See* Act of June 20, 1987, 70th Leg., 2d C.S., ch. 50, § 5, 1987 Tex. Gen. Laws 159, 161 (now at TEX. FAM.CODE ANN. § 3.003 (Vernon 1998)).

 The proceedings involved here were begun before April 20, 1995, the effective date of the recodified Family Code. The law in effect on the date the proceedings commenced governs this case. *See* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 3(a), 1995 Tex. Gen. Laws 113, 282. Thus, even though additional changes were made to the Family Code during the pendency of this case in the trial court and before this court, those changes do not apply here. All Family Code references are to the code in effect before April 20, 1995.

2. *See* Act of May 26, 1983, 68th Leg., R.S., ch. 298, § 2, 1983 Tex. Gen. Laws 1554, 1555 (now at TEX. FAM.CODE ANN. § 101.007 (Vernon 1996)).

3. For a more complete discussion of the underlying facts of Mr. Smith's case, see *Smith v. Herco, Inc.*, 900 S.W.2d 852 (Tex.App.-Corpus Christi 1995, writ denied).

4. *See* Act of May 31, 1969, 61st Leg., R.S., ch. 888, § 1, 1969 Tex. Gen. Laws 2707, 2726 (now at TEX. FAM.CODE ANN. § 3.002 (Vernon 1998)).

Property is characterized as "separate" or "community" at the time of the inception of title to the property. *See Parnell v. Parnell,* 811 S.W.2d 267, 269 (Tex.App.-Houston [14[th] Dist.] 1991, no writ). Inception of title occurs when a party first has right of claim to the property by virtue of which title is finally vested. *See Strong v. Garrett,* 148 Tex. 265, 271, 224 S.W.2d 471, 474 (1949); *Winkle v. Winkle,* 951 S.W.2d 80, 88 (Tex.App.-Corpus Christi 1997, pet. denied). Here, Mr. Smith's right to claim damages relating to the purchase of the townhouse arose before his marriage to Mrs. Smith. Therefore, even though he did not recover for these damages until after the marriage, the damages were his separate property. *See Roach v. Roach,* 672 S.W.2d 524, 530–31 (Tex.App.-Amarillo 1984, no writ) ("It is a familiar principle of law that the separate or community character of property is determined not by the acquisition of the final title . . . but by the origin of title.").

Mrs. Smith argues that Mr. Smith's right to claim the damage moneys relating to the townhouse purchase did not arise until after the trial court awarded him these moneys, which occurred during the marriage. Until he was awarded the damages, she argues, Mr. Smith did not have a legally enforceable right to the damages; he had, rather, a mere possibility of recovery. Therefore, she argues, the entire gross amount and that remaining in the account were community property. *See Wrightsman v. Commissioner of Internal Revenue,* 111 F.2d 227, 228 (5th Cir.1940).

▇▇▇ We disagree with this argument. For Mr. Smith to establish the damage award as his separate property, his right to the damages was not required to vest completely before marriage. To establish the award as his separate property, Mr. Smith merely had to show that before the marriage he had a right to claim the damages, he pursued that right, and the right to claim the damages later ripened. As the Fifth Circuit noted in *Wrightsman,* where the title has its incep-

tion in a claim or right that for whatever reason is not enforceable, so long as that claim is asserted throughout the limitations period, the title is referable not to the end of the limitations period but to the beginning of the assertion of the claim of right. *Id.* at 229.

Or as another commentator has said,

The status of the property of marital partners is determined by the time and circumstances attending its "acquisition." It is therefore helpful to keep in mind what is meant by "acquired." The term signifies the origin or inception of the right, rather than its later ripening or fruition.

SPEER'S MARITAL RIGHTS IN TEXAS § 388 (4th ed.).

Here, the damages that gave rise to Mr. Smith's cause of action for misrepresentation in the purchase of the townhouse occurred before the marriage. Therefore, Mr. Smith's right to the claim arose before marriage. The lawsuit was initiated before the marriage and pursued until his legal right to the $256,248.91 award ripened.

This conclusion accords with *Lewis v. Lewis,* 944 S.W.2d 630 (Tex.1997). There the Supreme Court found that where an unmarried worker suffered a job-related injury for which he claimed compensation, the net proceeds of the settlement remained his separate property even where the settlement was paid after the worker had married. The high court reasoned that the worker's loss was fully incurred before the community even existed. *See id.*

Like *Lewis,* Mr. Smith suffered damages before marriage even though he was not compensated until after the marriage. Following *Lewis,* we find the damages recovered in the suit are Mr. Smith's separate property.

▇▇▇ Mrs. Smith also argues that the $57,600 of Mr. Smith's gross recovery representing compensation for damages to his

credit rating was a loss suffered by the community estate, and therefore, this amount cannot be characterized as Mr. Smith's separate property. This argument, however, is contrary to *Lewis*, where the Supreme Court found that all the compensation benefits were the husband's separate property because his loss was fully incurred before the community even existed, and the wife did not contend that it worsened after the marriage. *See Lewis*, 944 S.W.2d at 630–31. Mrs. Smith never argued and does not argue on appeal that Mr. Smith's credit rating worsened during the marriage. Rather, she attempts to distinguish *Lewis by* arguing "Lewis involved a permanent loss to the husband's earning capacity while the present facts involve only a temporary loss to Mr. Smith's credit rating." Again, we fail to see the logic behind this distinction. Regardless of whether the loss is temporary—as here—or permanent—as in *Lewis*—when the damages occur before marriage, the ultimate recovery for these damages belongs to that spouse's separate estate. Mr. Smith's loss was incurred before marriage; therefore, compensation for that loss is his separate property.

Under both the inception-of-title rule and *Lewis*, of the $256,248.91 gross award, approximately $174,308.50 was Mr. Smith's separate property and approximately $81,940.41 belonged to the community estate. This gross amount was reduced by the payment of attorney's fees and other expenses totaling $94,935.74, which left a total net award deposited into the AFCU account of $161,313.17.

■ The separate and community estates shared this award as tenants in common. *See Cockerham v. Cockerham*, 527 S.W.2d 162, 168 (Tex.1975). As such, the tenants in common were required to share the expenses necessary to maintain the property. *See Gonzalez v. Gonzalez*, 552 S.W.2d 175, 181 (Tex.Civ.App.-Corpus Christi 1977, writ ref'd n.r.e.) (tenant in common who expends common funds for the preservation of common property enti-

tled in judicial partition to have those expenses charged to tenants in common in accordance with their pro rata ownership). The evidence shows the attorney's fees consumed approximately 37% of the original gross award. Therefore, the community's portion of the original net award—$161,313.17—was approximately $51,581.49 ($81,940.41—[$81,940.41 × 37.05%]), the separate estate's share, approximately $109,731.68 ($161,313.17—51,581.49) [Numbers are rounded.]

■ At the time of the parties' divorce, however, the account had a balance of approximately $100,000. The question for the trial court at this point was whether the funds spent from the commingled account were separate funds or community funds.

■ Generally, when separate property and community property are commingled in a single bank account, we presume that the community funds are drawn out first, before separate funds are withdrawn, and where there are sufficient funds at all times to cover the separate property balance in the account at the time of divorce, we presume that the balance remains separate property. *See Welder v. Welder*, 794 S.W.2d 420, 433 (Tex.App.-Corpus Christi 1990, no writ); *Horlock v. Horlock*, 533 S.W.2d 52, 58 (Tex.Civ.App.-Houston [14th Dist.] 1975, writ dism'd w.o.j.); *but cf. Goodridge v. Goodridge*, 591 S.W.2d 571, 573 (Tex.Civ.App.-Dallas 1979, writ dism'd w.o.j.) (even where expenditures from account were made exclusively for operating and maintaining husband's separate property, character of cash in account changed because of commingling of community and separate funds). "The only requirement for tracing and the application of the community-out-first presumption is that the party attempting to overcome the community presumption produce clear evidence of the transactions affecting the commingled account." *Welder v. Welder*, 794 S.W.2d at 434.

We assume, without deciding, that the community-out-first presumption is a rebuttable one.[5] Mrs. Smith, however, cites no evidence to rebut the presumption. *See* TEX.R.APP. P. 38.1(h), 38.2(a) (briefs must contain appropriate citations to the record.). The trial court was entitled to presume that the approximately $60,000 spent from the AFCU account came from community funds. After deducting $60,000 from the $51,581.49 community funds originally in the account, the community funds had been depleted.

Mr. Smith discharged his burden at trial by tracing and clearly identifying the funds in the AFCU account he claimed to be his separate property. *See Welder v. Welder,* 794 S.W.2d at 424. Once he did this, the statutory presumption that the account was a community asset ceased to exist. *See id.* at 425. Mrs. Smith, however, cites no evidence showing she rebutted the presumption that the $60,000 in expenditures were community expenditures. Under the evidence cited, the community's portion of the account was depleted, and the trial court erred in awarding Mrs. Smith $50,000 from this account.

 The trial court may not characterize separate property as community property. *See Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 140 (Tex.1977); *Leighton v. Leighton,* 921 S.W.2d 365, 368 (Tex. App.-Houston [1st Dist.] 1996, no writ). When a court mischaracterizes separate property as community property, the error requires reversal because a spouse is divested of separate property.[6] *See Eggemeyer,* 554 S.W.2d at 140; *Leighton,* 921 S.W.2d at 368. The funds remaining in the AFCU account was Mr. Smith's separate property. Under the evidence cited, therefore, the trial court had no authority to partition it. We sustain Mr. Smith's first and second points of error.

## PUFFER–SWEIVEN RETIREMENT PLAN

In his third and fourth points of error, Mr. Smith complains the trial court committed reversible error in dividing a retirement benefit account.

Mrs. Smith began working for Puffer–Sweiven, Inc., in 1982 and continued working at the company during her marriage to Mr. Smith. Through her employment,

---

**5.** We also note that a blind application of the community-out-first presumption does not uphold the policy reason for the presumption's original application. In *Sibley v. Sibley,* 286 S.W.2d 657, 659 (Tex.Civ.App.-Dallas 1955, writ dism'd w.o.j.), the court said that the spouse expending funds was in relationship to the funds as a trustee in relationship to a trust. In *Sibley,* the question involved the husband's spending funds from an account in which community funds had been commingled with the wife's separate funds. The application of the community-out-first-presumption thus preserved the wife's separate estate. Here, however, mechanical application of the community-out-first presumption leads to the husband's preserving his separate estate at the expense of the community. Were we to view the husband as a trustee acting in the best interest of the beneficiary, we would apply not the community-out-first presumption, but a separate-out-first presumption. We would presume the husband spent his own funds before spending the community funds thus leaving community funds in the account for possible disbursement to the beneficiary—

the wife—upon dissolution of the marriage. The husband would have the burden of rebutting the separate-out-first presumption. We apply the community-out-first presumption because it seems to be established law.

**6.** When a trial court mischaracterizes community property as separate property, however, reversal is not always required. *See, e.g., McElwee,* 911 S.W.2d at 189 (whether court commits reversible error by mischaracterizing community property as separate property not addressed by Supreme Court; once reversible error affecting "just and right" division of community estate found, however, court of appeals must remand entire community estate for new division); *Humphrey v. Humphrey,* 593 S.W.2d 824, 828 (Tex.Civ. App–Houston [14th Dist.] 1980, writ dism'd) (where overall property division equitable, trial court error in mischaracterizing house-sale proceeds as husband's separate property rather than community property harmless error not requiring reversal). *Also see* 39 GERRY W. BEYER, TEXAS PRACTICE: MARITAL PROPERTY AND HOMESTEADS § 20.9.5 (Supp.1999).

Mrs. Smith accumulated retirement benefits in Puffer–Sweiven's Employee Stock Ownership Plan ("ESOP"). Mrs. Smith's ESOP had two components: a money purchase pension plan and a profit-sharing plan. Mrs. Smith presented evidence at trial that, at the time of her marriage, the value of her ESOP was $32,457.[7] At the time of divorce, the ESOP had a value of $103,537.[8]

At trial and on appeal Mrs. Smith argues that the stock ownership plan account should be divided into separate and community portions based on the formula set out in *Berry v. Berry,* 647 S.W.2d 945, 947 (Tex.1983), *Taggart v. Taggart,* 552 S.W.2d 422, 424 (Tex.1977), and *Cearley v. Cearley,* 544 S.W.2d 661, 665–66 (Tex.1976). This formula is as follows:

$$\frac{\text{number of months married under plan}}{\text{number of months employed under plan}} \times \text{value at divorce} = \text{community interest}$$

Following this formula, Mrs. Smith calculated that she had been married 44% of the time she was employed by Puffer–Sweiven. She, therefore, concluded that 44% of the $103,537 in the plan at the time of the divorce was community property and that 56% of the plan was her separate property. She further proposed to the trial court that Mr. Smith receive 46.66% of the community's portion and that she receive 53.34%[9] of the community's portion. This would have led to a final distribution of 20% of the account to Mr. Smith and 80% of the account to Mrs. Smith. Mr. Smith, on the other hand, offered evidence of the balance of the account at marriage, the balance at divorce, and evidence that the account was a defined contribution account. The trial court in its judgment gave 20% of the ESOP's value to Mr. Smith and 80% to Mrs. Smith, in accordance with Mrs. Smith's proposed division.

 Mr. Smith argues on appeal that the trial court used the *Berry /Taggart /Cearley* method to allocate the community and separate portions of the stock ownership plan account and that this method was an incorrect application of the law. Mr. Smith argues that the *Berry /Taggart /Cearley* formula applies to a "defined benefits" plan and is inapplicable to

determine the community interest in "defined contribution plans," such as the plan here at issue. *See Baw v. Baw,* 949 S.W.2d 764, 767 (Tex.App.-Dallas 1997, no writ); *Pelzig v. Berkebile,* 931 S.W.2d 398, 402 (Tex.App.-Corpus Christi 1996, no writ); *Hatteberg v. Hatteberg,* 933 S.W.2d 522, 531 (Tex.App.-Houston [1st Dist.] 1994, no writ); *Iglinsky v. Iglinsky,* 735 S.W.2d 536, 538 (Tex.App.-Tyler 1987, no writ). A defined benefit plan—such as the plans in *Berry, Taggart,* and *Cearley*—promises employees a monthly benefit beginning at retirement. The benefit is based on the number of years of service the employee has at the time of retirement, along with other factors such as age and salary history. *See* Steven R. Brown, *An Interdisciplinary Analysis of the Division of Pension Benefits in Divorce and Post–Judgment Partition Actions,* 37 BAYLOR L.REV. 107, 115 (1985). Historically, defined benefit plans have been complicated to apportion upon divorce because their value at any given time is difficult to ascertain. Thus, the Supreme Court developed a special formula to aid courts in making this calculation. *See Baw,* 949 S.W.2d at 768.

The proper value of a defined contribution plan, on the other hand, is not difficult to determine. An employee participating

---

7. This amount represents the value of the ESOP as of September 30, 1990. Neither party disputes that this was the value of the plan at the time of the marriage.

8. This amount represents the value of the ESOP as of September 30, 1995.

9. Her proposed division chart actually suggested that she receive 853.34% of the community interest. We presume this was a misprint.

in a defined contribution has a separate account similar to a savings account into which the employee and employer make contributions. *See Hatteberg*, 933 S.W.2d at 531. The value of this account can be readily ascertained at any time by simply looking at the account. *See id.* at 531. Thus, in order to determine the community interest in a defined contribution plan, courts subtract the value of the plan at the time of marriage from the value of the plan at the time of divorce. *See Pelzig*, 931 S.W.2d at 402.

We agree with Mr. Smith that application the *Berry/Taggart/Cearley* formula would have been incorrect. The trial court should have determined the community formula by subtracting the account balance at marriage, about $32,000, from the account balance at divorce, about $103,000, to determine the community's portion, or that portion accumulated during marriage. Using these approximate figures, the community's portion would be about $71,000. Had the trial court divided the community's portion equally, which it was not bound to do, Mr. Smith's portion would have come to about $35,500, about $14,500 more than the approximately $21,000 he received.

The problem we face, however, is that we cannot determine the basis of the trial court's decision. In the trial court's judgment, it split the account 80% to Mrs. Smith, 20% to Mr. Smith. In its findings of fact and conclusions of law, the court said the portion it gave to Mrs. Smith "represents her demonstrated separate property interest and her share of the community interest in the Plan." The trial court did not specify how much of that 80% was Mrs. Smith's share of the community portion and how much was her separate property. Although it may seem common-sensical that the trial court followed Mrs. Smith's reasoning and used the *Berry/Taggart/Cearley* formula to divide the account, we cannot determine from the record if that was the basis of the court's decision. Instead, the court may have

used the proper formula for determining the community's portion—the formula Mr. Smith advocates—and may have given a disproportionate share of the community to Mrs. Smith. In giving a disproportionate share to Mrs. Smith the court could have relied on factors such as Mr. Smith's history of unemployment during the marriage and Mrs. Smith's lower educational level and lower income potential.

As discussed above, we review fact findings in a bench trial for legal and factual sufficiency of the evidence by the same standards used in reviewing the evidence supporting a jury's verdict, *see Ortiz v. Jones*, 917 S.W.2d at 772, and review the trial courts conclusions of law de novo as legal questions, *see Piazza v. City of Granger*, 909 S.W.2d at 532.

It is presumed that all fact findings needed to support the judgment were made by the trial judge. *See Carter v. William Sommerville and Son, Inc.*, 584 S.W.2d 274, 276 (Tex.1979). *See also* 6 McDonald & Carlson, Texas Civil Practice § 18:6 (1998). After the court files original findings of fact and conclusions of law, any party may file with the clerk of the court a request for specified additional or amended findings or conclusions. Tex.R. Civ. P. 298. Failure by a party to request additional amended findings or conclusions waives the party's right to complain on appeal about the presumed finding. *See Operation Rescue–National v. Planned Parenthood of Houston and Southeast Texas, Inc.*, 937 S.W.2d 60, 82 (Tex.App.-Houston [14th Dist.] 1996), *aff'd as modified*, 975 S.W.2d 546 (1998); *Dallas Morning News Co. v. Board of Trustees of the Dallas Indep. Sch. Dist.*, 861 S.W.2d 532, 538 (Tex.App.-Dallas 1993, writ denied).

Here, the trial court filed findings and conclusions that will support a conclusion that the court understated the community by calculating the community's portion of the account based on the *Berry/Taggart/Cearley* formula. The finding and conclusions also will support a conclu-

sion that the trial court properly calculated the community's portion of a defined contribution account but gave Mrs. Smith a disproportionate share of the community. Although the trial court would have erred by understating the value of the community had it allocated the community and separate portions of the account based on the *Berry /Taggart /Cearley* formula, we cannot now determine if the court in fact did so. Mr. Smith had the responsibility of requesting additional findings and fact and conclusions of law in connection with the disproportionate division of the community or in connection with the trial court's calculation of the community's portion. *See* Tex.R. Civ. P. 298. By failing to request additional findings and conclusions, Mr. Smith waived his right to complain on appeal about any error he assumes the court made. *See Operation Rescue–National,* 937 S.W.2d at 82; *Dallas Morning News Co.,* 861 S.W.2d at 538.

 Mr. Smith also complains that the stock ownership plan account comprised shares of stock and that Mrs. Smith failed to trace and identify her separate funds properly and, therefore, failed to overcome the community presumption. An increase in the value of separate-property stock remains separate property. *See Horlock,* 533 S.W.2d at 60; *Ridgell v. Ridgell,* 960 S.W.2d 144, 150 (Tex.App.-Corpus Christi 1997, no writ) ("Stock received by dividends on stock purchased by a spouse prior to marriage remains the separate property of the spouse."). Although Mr. Smith correctly argues the law, he can demonstrate no harm. The best he could have hoped for was that the entire $103,000 in the account would have been found community property. The trial evidence showed, however, that approximately $32,000 of the account, the value of the account upon the couple's marriage, was Mrs. Smith's separate property. Therefore, considering the trial evidence, we would find that the community's portion of the account could be, at most, all of the increase, or $71,000. Although any tracing

by Mrs. Smith would diminish the value of the community's portion, Mr. Smith has failed to demonstrate that the trial court in any way relied upon improper or inadequate tracing.

Mr. Smith failed to demonstrate reversible error in his complaint about the trial court's division of the Puffer–Sweiven ESOP account. We overrule his third and fourth points of error.

### *PRO SE* LITIGANT'S RIGHT TO ADVISORY COUNSEL AT TRIAL

In his fifth point of error, Mr. Smith argues that the trial court violated his Sixth Amendment and due process rights by refusing to allow him to have advisory counsel present during trial.

Two weeks before trial, Mr. Smith discharged his attorney. The day of trial, Mr. Smith asked for a continuance, which the judge refused. Mr. Smith then announced he would appear *pro se,* but with advisory counsel. He told the court that the advisory counsel would not question witnesses but would help him make proper objections and help him observe the courtroom formalities. The trial judge appeared reluctant to allow such a scheme, addressing the attorney as follows:

> Then it seems to me that you have logistically I call it a problem or question, and that is these—I don't want every question or every answer to be followed by a five-minute or a one-minute hiatus whereby the pro se litigant representing himself turns to confer to his attorney of record who's not going to be asking any questions and gets advice on every single question, every single possible objection, every single answer, every single possible objection.

The judge nevertheless allowed Mr. Smith to proceed with advisory counsel during the first day of trial. The record does not show the advisory counsel made any statements, asked any questions, or made any objections during the first day.

On the second day of trial, Mrs. Smith's attorney renewed her objections to the advisory counsel, citing *Posner v. Dallas County Child Welfare Unit*, 784 S.W.2d 585 (Tex.App.-Eastland 1990, writ denied), for the proposition that a *pro se* litigant has no right to hybrid representation. After listening to arguments, the trial judge excluded Mr. Smith's advisory counsel during the second day of testimony. The court's comments suggest that it read *Posner* as forbidding hybrid representation.

■■■ As an initial matter, we note that although Mr. Smith relies in part on the Sixth Amendment right to counsel, the Sixth Amendment by its very words applies only to criminal defendants. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."); *United States v. Rogers*, 534 F.2d 1134, 1135 (5th Cir.1976). As a civil litigant, Mr. Smith has no right to hybrid and advisory counsel under the Sixth Amendment. Whatever rights he may have must arise elsewhere.

■■■ A civil litigant is entitled to appear in court and be represented by counsel of his or her own selection. *See Farmers' Gas Co. v. Calame*, 262 S.W. 546, 548 (Tex.Civ.App.-Waco 1924, no writ). Under state rules, a litigant has the option of appearing in person or by an attorney. *See* TEX.R. CIV. P. 7; *Kunstoplast of America, Inc. v. Formosa Plastics Corp.*, 937 S.W.2d 455, 456 (Tex.1996). The federal courts apply similar rules. *See* 28 U.S.C.A. § 1654 (West 1996); *O'Reilly v. New York Times Co.*, 692 F.2d 863, 868 (2d Cir.1982).

Most cases dealing with question of hybrid representation fall within the criminal sphere. In criminal cases, state and federal courts generally have found that although a defendant has a right to self representation or representation by counsel, he or she has no right to hybrid representation. *See United States v. Daniels*, 572 F.2d 535, 540 (5th Cir.1978) (where defendant represented by counsel, defendant may not insist that he be able to call particular witness where counsel has declined to call that witness, unless counsel's actions deny defendant's Sixth Amendment rights); *Landers v. State*, 550 S.W.2d 272, 278 (Tex.Crim.App.1977) (no right to hybrid representation arising from Article 10, section 1, of the state constitution). Although state and federal courts find generally that hybrid representation for criminal defendants is not a right, neither is such representation prohibited. *See United States v. Treff*, 924 F.2d 975, 979 (10th Cir.1991) (decision to allow hybrid representation and to limit defendant's participation in such representation within discretion of trial court); *Brasier v. Jeary*, 256 F.2d 474, 478 (8th Cir.1958) (where party represented by competent counsel, his case should be conducted by that counsel unless it becomes apparent that interests of justice require party's active participation); *Busselman v. State*, 713 S.W.2d 711, 714 (Tex.App.-Houston [1st Dist.] 1986, no writ) (trial court may, in its discretion, allow hybrid representation and may grant relief in such situations, in which case parties will be bound by court's rulings).

■■■ Appellate courts review questions of the appointment or choice of counsel under an abuse of discretion standard. *See Andrews v. Bechtel*, 780 F.2d 124, 137 (1st Cir.1985) (trial court did not abuse discretion by allowing plaintiff's attorney to withdraw where plaintiff decided attorney should cease representing him); *Ayres v. Canales*, 790 S.W.2d 554, 557 (Tex.1990) (court abused discretion by ordering party to be represented by an attorney; such order violated rule providing that "[a]ny party to a suit may appear and prosecute or defend his rights there, either in person or by an attorney of the court."); *Thomas v. Anderson*, 861 S.W.2d 58, 60 (Tex.App.-El Paso 1993, no writ) (trial court abused discretion in appointing counsel in civil case where record did not show litigant's financial inability to employ counsel). We

likewise will review the trial court's action here under an abuse of discretion standard.

At trial, Mrs. Smith relied upon *Posner* for the proposition that Mr. Smith was not entitled to hybrid representation. In *Posner*, a party represented by counsel on appeal attempted to file a *pro se* brief. The appellate court found that the party was not entitled to hybrid representation and that the *pro se* brief presented nothing for review. *See id.* at 588. The court used no language forbidding hybrid representation. *See also In re Sondley*, 990 S.W.2d 361, 362 (Tex.App.-Amarillo 1999, no pet.) (following *Posner*).

Mr. Smith attempts to distinguish *Posner* by differentiating between hybrid representation and standby representation. In hybrid representation, the litigant and attorney actively participate in the trial process. *See Bayless v. United States*, 381 F.2d 67, 71 (9th Cir.1967) (court allowed both attorney and defendant to participate in cross-examination). In standby representation, the litigant conducts his or her own case with the advice and counsel of an attorney. *See United States v. Sacco*, 563 F.2d 552, 554 (2d Cir.1977) (defendant conducted his own defense with appointed counsel acting as advisor).

Mr. Smith contends that *Posner* is not applicable here because *Posner* dealt with a type of hybrid representation in which the both the attorney and the litigant attempted to participate actively in the appellate litigation process. Here, on the other hand, the litigant attempts to conduct his own trial, with the quiet assistance of an attorney. Thus, this situation more closely resembles standby, rather than hybrid, representation.

We agree that *Posner* deals with hybrid representation rather than standby representation. The Fifth Circuit, however, has addressed the issue of standby representation in *Neal v. Texas*, 870 F.2d 312 (5th Cir.1989). In that case, a former district attorney, a licensed attorney, faced a charge of official misconduct. When the defendant-attorney attempted to proceed to trial with advisory counsel, the trial court denied his request. On habeas review, the Fifth Circuit held the trial court's refusal to allow advisory counsel to the *pro se* criminal defendant did not abrogate the defendant's constitutional right to assistance of counsel and the defendant had no right to "hybrid" representation. *See id.* at 315–16. The reviewing court noted that although the appointment of standby counsel was preferred, it was not mandatory. *See id.* at 316. We note that *Neal* is a criminal case relying on the Sixth Amendment, which does not apply to civil cases.

■■■ The trial court here expressed concern that having advisory counsel at the litigant's table would disrupt the proceedings. The court also may have misread *Posner* as forbidding hybrid or standby representation. As mention above, we have found no case dealing with the federal due process rights to hybrid or standby representation in a civil case. Nevertheless, we also have found no case in which a reviewing court has overturned a trial court's decision rejecting a request for hybrid or standby representation. Indeed, many trial courts, concerned about a defendant's ability to effectively present his or her case, seem willing to appoint standby representation in criminal matters. We cannot, however, say that the trial court abused its discretion without finding a due process right to standby or advisory counsel. Such a finding would run counter to the broad discretion granted trial courts governing trial procedures. *See Hoggett v. Brown*, 971 S.W.2d 472, 495 (Tex.App.-Houston (14th Dist.) 1997, pet. denied) (court's "inherent power" together with applicable rules of procedure and evidence accord judges broad, but not unfettered, discretion in handling trials; judge responsible for general conduct and management of trial); *Metzger v. Sebek*, 892 S.W.2d 20, 38 (Tex.App.-Houston [1st Dist.] 1994, writ denied) (judge responsible for general conduct and management of trial and has discretion to properly intervene in pro-

ceedings to maintain control and promote expedition). We, therefore, find no such due process right to standby or hybrid representation.

■ We note that although Mr. Smith was requesting a type of standby representation rather than hybrid representation, the difference between standby representation and hybrid representation is not a bright line but a gray area with greater and lesser degrees of attorney involvement. It is because of this gray area that we must give the trial court discretion to determine whether to allow hybrid or standby representation to control the decorum of the courtroom.

■ Mr. Smith further argues that even if the trial court had the discretion to exclude standby counsel on the first day of trial, after the trial judge allowed counsel on the first day, the court abused its discretion by excluding the counsel on the second day.

■ This argument is unpersuasive. Mr. Smith has failed to demonstrate harm arising from the trial court's change in position. If anything, having advisory counsel for a day was a windfall. Whatever trial strategy Mr. Smith had was presumably in place on the first day. He most likely continued his preexisting strategy. Although a trial court should as soon as possible advise the litigant whether he or she may proceed with hybrid or standby representation, *cf. Scarbrough v. State*, 777 S.W.2d 83, 93 (Tex.Crim.App.1989), we find no abuse of discretion sufficient to warrant reversal.

We wish to emphasize, however, that hybrid or standby representation is not prohibited and that such representation may, from the trial court's point of view, be preferable to wholly *pro se* representation, leading to fewer disruptions and delays. We, nevertheless, overrule Mr. Smith's fifth point of error.

## CONCLUSION

Having found that the trial court committed reversible error by mischaracterizing Mr. Smith's separate property as community property and by divesting Mr. Smith of his separate property, we reverse the trial court's decision on the issue of the division of the community estate only and remand for further proceedings in conformity with this opinion. We affirm and sever the remainder of the judgment.[10]

Concurring opinion delivered by Justice HUDSON.

J. HARVEY HUDSON, Justice, concurring.

Two weeks before trial, Bruce discharged his attorney. On the day of trial, Bruce asked for a continuance. The judge refused to grant the continuance. Bruce then announced he would proceed *pro se*, but that he had hired advisory counsel to sit with him during the trial. When questioned by the court, counsel announced that he was not prepared to take an active role in the case because he had been retained only a short time before trial. Bruce again reiterated that he would represent himself in all phases of the trial and that he would rely on counsel only for occasional advice and private consultation. Kathleen's attorney was skeptical of the procedure and the trial judge warned Bruce that she would not permit him to retard or delay the proceedings by pausing for frequent conferences with his counsel. With this admonition, the trial judge permitted the arrangement.[1]

---

10. Appellant has not challenged the trial court's determinations as to conservatorship of the minor children and child support. Accordingly, we may affirm and sever the issues of the divorce, conservatorship, and support, and remand only for a new property division.

*See Herschberg v. Herschberg*, 994 S.W.2d 273, 277 (Tex.App.–Corpus Christi 1999, no pet.).

1. The trial judge remarked:
 Well, I'm willing to try it. I don't think I can bar you from doing it. I don't think I can bar him from having an attorney. Ab-

As promised, counsel did not "represent" appellant in the proceedings, but acted only in an advisory capacity. However, at the commencement of the second day of trial, Kathleen's attorney suggested to the court that the arrangement was a form of hybrid representation, prohibited in civil cases. Relying upon *Posner v. Dallas County Child Welfare*, 784 S.W.2d 585 (Tex.App.-Eastland 1990, writ denied), the trial court reversed its earlier ruling, briefly considered declaring a mistrial, and finally prohibited advisory counsel from remaining in the courtroom. Advisory counsel objected to his exclusion and argued that although Bruce was representing himself *pro se*, due process under both the state and federal constitutions mandated that he should be permitted to have as effective and competent representation as possible under the circumstances. Thus, the issue is the fundamental question of whether Bruce had a constitutional right to retain counsel to assist him in his divorce proceedings.

Under English common law, the practice of utilizing attorneys in civil litigation has long been the accepted custom. By a statute of Henry VII in 1495, Englishmen were not only endowed with the right to retain attorneys to represent them in civil cases, indigent parties were guaranteed the services of a free lawyer.[2] The opposite custom, however, prevailed in criminal cases. Until 1836, those charged with felony crimes under English common law were denied the right to retain and be represented by counsel.[3] *See Powell v. Ala-*

*bama*, 287 U.S. 45, 60, 53 S.Ct. 55, 77 L.Ed. 158 (1932). This common law tradition was sharply reversed and rejected by the American constitution which specifically provides that the accused in a criminal case is permitted to retain counsel to represent him before the court. *See* U.S. CONST. amend VI.

By its own clear language, however, the Sixth Amendment does not apply in civil cases. *See Father & Sons Lumber and Bldg. Supplies, Inc. v. N.L.R.B.*, 931 F.2d 1093, 1097 (6th Cir.1991); *United States v. Rogers*, 534 F.2d 1134, 1135 (5th Cir.1976). The same is true of Article I, section 10 of the Texas Constitution. *See Harris v. Civil Service Com'n*, 803 S.W.2d 729, 731 (Tex.App.-Houston [14th Dist.] 1990, no writ). However, at the time these provisions were adopted, the right to retain counsel in civil cases was assumed.[4] Thus, these constitutional provisions were not intended to infringe upon the accepted right of a party to retain counsel in a civil case, but rather, to explicitly overrule the common law tradition of *denying* counsel to criminal defendants. It is plain, however, that if the federal constitution guarantees the right to be heard by counsel in a civil case, it will not be found in the Sixth Amendment.

The due process clause of the Fifth Amendment states that no person shall "be deprived of life, liberty, or *property*, without due process of law." *See* U.S. CONST. amend V (emphasis added). The same language is made applicable to the

---

solutely a litigant can represent himself and absolutely a litigant can hire an attorney and absolutely a litigant can hire two attorneys. And I have never thought about it before, I confess. Not more than five minutes ago, ten minutes ago was the first time I thought about the possibility. But I don't know that I can automatically bar him.

**2.** *See* Hon. Earl Johnson, Jr., *The Right to Counsel in Civil Cases: An International Perspective*, 19 LOY. L.A. L.REV. 341, 342 (1985).

**3.** Even in capital cases, defendants were not permitted to be represented by counsel. *See* 4

WILLIAM BLACKSTONE, COMMENTARIES 349 (1769). At one time, the accused was not even permitted to call witnesses in his defense. Blackstone records: "Lastly, it was an antient [sic] and commonly received practice, (derived from the civil law, and which also to this day obtains in the kingdom of France) that, as counsel was not allowed to any prisoner accused of a capital crime, so neither should he be suffered to exculpate himself by the testimony of any witnesses." 4 BLACKSTONE, at 352.

**4.** *The Right to Counsel in Civil Litigation*, 66 COLUM. L. REV. 1322, 1327 (1966).

states in the Fourteenth Amendment. *See* U.S. Const. amend. XIV. Thus, due process protections extend to civil, as well as criminal, proceedings.

The most fundamental concept of due process is the right to a hearing. *See Hovey v. Elliott,* 167 U.S. 409, 417, 17 S.Ct. 841, 42 L.Ed. 215 (1897); *Derbigny v. Bank One,* 809 S.W.2d 292, 295 (Tex. App.-Houston [14th Dist.] 1991, no writ). Yet the "right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell,* 287 U.S. at 69, 53 S.Ct. 55. Thus, "[i]f in any case, *civil* or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." *Id.* (emphasis added).

This is not to say that a civil litigant has a constitutional right to appointed counsel. While a trial judge may occasionally appoint counsel to represent an indigent party,[5] a civil litigant has no constitutional right to a free lawyer.[6] *See Sandoval v. Rattikin,* 395 S.W.2d 889, 893–94 (Tex.Civ. App.-Corpus Christi 1965, writ ref'd n.r.e.), *cert. denied,* 385 U.S. 901, 87 S.Ct. 199, 17 L.Ed.2d 132 (1966). Nevertheless, his right to be heard through his own counsel is absolute.[7]

Here, Bruce did not choose to be "heard" through counsel. His lawyer was not employed to "represent" him or appear on his behalf, but only to advise him during the course of trial. However, I do not believe this distinction takes this scenario beyond the protections of the Fifth and Fourteenth Amendments. Bruce had a constitutional right to hire an attorney to assist him in this cause. While most laymen choose to use their attorneys to "represent" them in court, Bruce chose to use his attorney only to "advise" him in court. This may have been a foolish use of legal resources, but I believe Bruce's decision to utilize counsel in this manner was constitutionally protected.

This is not to say that Bruce had a right to hybrid representation. Dual representation by a layman and his lawyer can produce a confusing cacophony of contradictory requests and petitions that delay the orderly proceedings of a court. Here, however, there was but one spokesman for the appellant—Bruce. The record does not suggest that counsel's presence was disruptive or that Bruce's consultation with counsel delayed the proceedings.

By attempting to represent himself, Bruce was disadvantaged from the outset. Laymen simply cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries. *See Brotherhood of Railroad Trainmen v. Virginia,* 377 U.S. 1, 7, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964). Although he represented himself *pro se,* Bruce retained an attorney to provide him advice and counsel in making strategic decisions. This was, I believe, his constitu-

---

5. "In some exceptional cases, public and private interests at stake are such that the administration of justice may best be served by appointing a lawyer to represent an indigent civil litigant." *Coleman v. Lynaugh,* 934 S.W.2d 837, 839 (Tex.App.-Houston [1st Dist.] 1996, no writ). *See also* Tex. Gov't Code Ann. § 24.016 (Vernon 1988).

6. Lawyers are appointed to represent indigent parties in civil actions in England, France, Germany, Norway, Sweden, Denmark, Belgium, Netherlands, Austria, Spain, Portugal, Italy, Switzerland, New Zealand, many of the Australian states, and most of the Canadian provinces. *See* Johnson, at 342–48. "When it comes to the legal entitlement to free counsel for indigent civil litigants, the United States is in a distinct minority among the industrial democracies of the world." *Id.* at 345.

7. The right to retain counsel of one's choice must yield only where the failure to maintain ethical standards of professional responsibility would threaten the very integrity of the judicial process. *See Warrilow v. Norrell,* 791 S.W.2d 515, 523 (Tex.App.-Corpus Christi 1989, writ denied).

tional right, and the trial court erred in refusing to allow him to utilize his retained advisory counsel.

Accordingly, I respectfully disagree with the majority's disposition of Bruce's final point of error. However, I join the majority opinion in all other respects and concur in the decision to reverse the trial court's judgment and to remand the cause to the trial court.