

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00061-CV

_____

IN THE MATTER OF THE MARRIAGE OF
EVERETT ALTON TAYLOR, JR., AND DOCHIA ANN TAYLOR
AND IN THE INTEREST OF R.N.T., A CHILD

On Appeal from the County Court at Law
Panola County, Texas
Trial Court No. 2013-093

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Moseley

# MEMORANDUM OPINION

Everett Alton Taylor (Everett) and Dochia Ann Taylor (Dochia) were married on January 9, 1999, and divorced on May 20, 2014. Pursuant to jury findings, the final decree of divorce determined the contested properties (American Equity policy number 1968 and Great American policies numbered 7656 and 7711[1]) to be comprised of fifty-six percent of Everett's separate estate and forty-four percent of community funds of the marriage of Everett and Dochia. Dochia has appealed from this determination, claiming these assets to be entirely community property in nature. In doing so, she disputes that Everett presented legally and factually sufficient evidence of his separate property claim to support the jury's finding and the trial court's judgment. We disagree with Dochia, determining that there is sufficient evidence to support the jury's finding and affirm the trial court's judgment.

## I. Background

Before Everett married Dochia, he had been a participant in three different retirement programs offered through his employer, Pennzoil, and in one individual retirement account (IRA). The retirement programs with Pennzoil included a 401(k) retirement plan, an hourly employee pension plan (hourly pension) and a salaried employee pension plan (salary plan).[2] Immediately before their marriage, the IRA had a value of $7,893.23, and the 401(k) plan had a value of $103,559.16. Everett testified that the IRA was rolled over into the Oppenheimer Main Street Small Cap Fund Class B (to which the parties made reference as account #4674) on

---

[1] Although the documents creating these accounts are not a part of the record, we assume these to be annuities. Throughout this opinion, we have endeavored to simplify the identification of the various accounts by using the same references employed by the parties at trial and in their briefs.

[2] The parties agreed to the division of the salaried employee pension, and it is not a part of this appeal.

December 27, 2000. At the time of the rollover, the IRA had increased in value to $8,549.40. Everett also testified that on July 19, 2002, the 401(k) was also rolled over into that same account and that it had increased in value to $143,139.53. Homer Stout, the account representative with Forester Equity who handled Everett's retirement accounts from 2000 to 2013, confirmed these rollovers and produced account records verifying the transactions. On October 5, 2005, the assets in account #4674 were transferred to another Oppenheimer fund account to which the parties made reference as account #4267. On July 12, 2006, the assets of account #4267 were transferred to a third Oppenheimer fund account, this being one to which the parties referred as account #0449.[3] The assets in these accounts traced through to several different funds until, on April 7, 2010, the assets were finally transferred to the Oppenheimer Strategic Income Class A Fund (to which the parties referred as account #5798) and to the Oppenheimer Strategic Income Class B Fund (to which the parties referred as account #5934). On that final date, the assets transferred to these funds had a value of $158,544.00 and $10,970.92, respectively.

Everett's hourly pension was fully earned and vested prior to his marriage to Dochia. Under that retirement plan, Everett would have been entitled to receive $953.48 per month in pension payments after he attained the age of sixty-five. Although there was no evidence introduced of the value of the hourly pension on the date of marriage, Everett testified that he took a lump sum payment in the amount of "$89,000 some odd" in full satisfaction of that asset when he was fifty-five. Everett testified that he took this sum and placed it in the Oppenheimer

---

[3]Although there were no records produced for account #4267, Stout testified that these were the same funds originally rolled over from Everett's pension.

Strategic Income Class A Fund, account #5798, on July 12, 2006. Stout confirmed this by testifying that on that date, $89,582.68 was deposited into that account, and account records revealed that on that same date, the assets from account #7997 were transferred to purchase 20,364.103 shares of Oppenheimer Strategic Income Class A Fund in account #5798.[4] Stout testified (and the Oppenheimer fund records confirm) that the value of the different funds varied through the years due to depreciation and appreciation, and through reinvestment of dividends, reinvestment of capital gains, and additional contributions. In addition, Everett explained that various withdrawals from the funds were applied to regular living expenses, to a settlement with his daughters from his previous marriage, to taxes, to a down payment on a farm he and Dochia purchased, and to the monthly note payments related to the purchase of the farm.

On April 1, 2013, Everett closed the Oppenheimer funds. At that time, the funds had a cumulative value of $224,237.99. Everett rolled over $200,000.00 of the assets to Evans Financial Group to purchase three annuity policies: American Equity policy number 991968 (American Equity 1968), Great America policy number 1192037656 (Great American 7656), and Great American policy number 1192037711 (Great American 7711). Everett testified that he used the remaining funds to pay his attorneys and other expenses of the divorce.

After a trial on the merits, a jury was asked to determine the relative percentages held in each of these policies by Everett's separate estate and the community estate of the marriage of

---

[4]No records for account #7997 were introduced, and there was no testimony regarding the history or origins of account #7997.

Everett and Dochia.[5]  The jury found that both of the policies were owned fifty-six percent by Everett as his separate estate, and forty-four percent belonged to the community of Everett and Dochia's marriage.  The trial court entered its final decree of divorce in accord with the jury findings, awarding Everett the policies minus twenty-two percent of each.  Dochia timely filed a motion for new trial asserting that the evidence was legally and factually insufficient to support either the jury's answers as they related to each of the policies or the trial court's final decree based on those answers.  This motion was overruled by order of the trial court.

## II.    Standard of Review

There is a strong presumption that all property in the possession of either spouse during or at the dissolution of the marriage is community property.  TEX. FAM. CODE. ANN. § 3.003(a) (West 2006).  A party seeking to overcome the community property presumption must do so by presenting clear and convincing evidence.  TEX. FAM. CODE. ANN. § 3.003(b) (West 2006); *Cockerham v. Cockerham*, 527 S.W.2d 162, 167 (Tex. 1975); *In re Marriage of Kluth*, No. 06-07-00129-CV, 2008 WL 2150961, at *1 (Tex. App.—Texarkana May 23, 2008, no pet.) (mem. op.).  Where the burden of proof is clear and convincing evidence, we review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the finding and determine whether a reasonable jury could have formed a firm belief or conviction that the finding was true.  *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).  We also assume that the jury resolved disputed facts in favor of its finding if a reasonable jury could do so, and we

---

[5]The jury was also asked to determine what percentage of a farm purchased during the marriage was the separate property of Everett and what percentage was the community property of the parties.  The jury found the farm was 100 percent community property, and this finding was not appealed.

disregard all contrary evidence that a reasonable jury could have disbelieved or found to be incredible. *Id.*

In reviewing factual sufficiency challenges, we review all the evidence in the record, both supporting and opposing the findings of the finder of facts. *See In re C.H.*, 89 S.W.3d 17, 27–29 (Tex. 2002). We give due consideration to evidence the jury could have reasonably found to be clear and convincing. *Id.* at 25. Under this standard, we determine whether the evidence is such that the trier of fact could reasonably form "a firm belief or conviction" as to the truth of the allegations sought to be established. *Id.* When there is disputed evidence, we must consider whether it is such that a reasonable jury could not have reconciled the disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266.

Separate property includes "the property owned or claimed by the spouse before marriage." TEX. FAM. CODE ANN. § 3.001(1) (West 2006). We determine whether property is separate or community by its character at the time of inception. *Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex. 2001). "Inception of title occurs when a party first has a right of claim to the property by virtue of which title is finally vested." *Zagorski v. Zagorski*, 116 S.W.3d 309, 316 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citing *Smith v. Smith*, 22 S.W.3d 140, 145 (Tex. App.—Houston [14th Dist.] 2000, no pet.)). Further, to overcome the community property presumption, the spouse claiming property is separate "must clearly trace the original separate property into the particular assets on hand during the marriage." *Cockerham*, 527 S.W.2d at 167; *see also McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex. 1973); *Tarver v. Tarver*, 394 S.W.2d 780, 783 (Tex. 1965); *Zagorski*, 116 S.W.3d at 316. "Tracing involves establishing the separate

origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Zagorski*, 116 S.W.3d at 316; *In re Marriage of Parker*, 997 S.W.2d 833, 837 (Tex. App.—Texarkana 1999, pet. denied). Even though the separate property may go through a series of exchanges, it will retain its separate character if the party can trace the assets on hand during the marriage to property that was separate when first acquired. *Celso v. Celso*, 864 S.W.2d 652, 654 (Tex. App.—Tyler 1993, no writ) (citing *Cockerham*, 527 S.W.2d at 167).

When separate property is commingled with community property in a single account, the separate property retains its character when it can be traced sufficiently to enable the fact-finder to determine the interest of each party. *Zagorski*, 116 S.W.3d at 319 (citing *Holloway v. Holloway*, 671 S.W.2d 51, 60 (Tex. App.—Dallas 1983, writ dism'd)). Further, when separate and community funds are commingled in a single account and a portion of those funds are withdrawn, it is presumed that the community funds are the first to be withdrawn. *Id.* at 319–20 (citing *Smith*, 22 S.W.3d at 146). For the community-out-first presumption to apply, the party seeking to overcome the community property presumption need only show clear evidence of the transactions affecting the account. *Id.* at 320; *see McKinley v. McKinley*, 496 S.W.2d 540 (Tex. 1973); *Hill v. Hill*, 971 S.W.2d 153 (Tex. App.—Amarillo 1998, no pet.); *Welder v. Welder*, 794 S.W.2d 420 (Tex. App.—Corpus Christi 1990, no writ). If the party shows that separate funds were deposited and that the balance of the account never reached zero, then "it is presumed that the balance contains separate property equaling the amount of the separate funds initially deposited less withdrawals encroaching upon the deposit or deposits." *Hill*, 971 S.W.2d at 158.

7

The tracing in this case is complicated somewhat by the fact that both cash dividends and capital gains were reinvested in the various funds. Cash dividends paid to married owners of mutual fund shares held as separate property are community property. *In re Marriage of Born*, No. 06-08-00066-CV, 2009 WL 1010876, at *2 (Tex. App.—Texarkana Apr. 16, 2009, no pet.) (mem. op.) (citing *Bakken v. Bakken*, 503 S.W.2d 315, 317 (Tex. Civ. App.—Dallas 1973, no writ)); *LeGrand-Brock v. Brock*, 246 S.W.3d 318, 322 (Tex. App.—Beaumont 2008, pet. denied). However, the increase in value of separate property resulting from market fluctuations remains separate property. *See Dillingham v. Dillingham*, 434 S.W.2d 459, 461–62 (Tex. Civ. App.—Fort Worth 1968, writ dism'd). Thus, the profit, or gain, realized from the sale of mutual fund shares owned as separate property is also separate property, as would be any additional shares purchased with the gain. *Bakken v. Baker*, 503 S.W.2d 315, 317–18 (Tex. Civ. App.— Dallas 1973, no writ).

### III. Analysis

Applying these rules to the facts of this case, Everett failed to clearly trace the funds used to initially purchase the shares in account #5798 to his separate property hourly pension. Everett testified that he took a lump sum payment of this pension when he was fifty-five, that it was around $89,000.00, and that he rolled these funds over into account #5798. However, he presented no evidence of the date of this buyout or the exact amount of the buyout. "Mere testimony that property was purchased with separate property funds, without any tracing of the funds, is generally insufficient to rebut the community presumption." *Zagorski*, 116 S.W.3d at 316 (citing *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex. App.—Houston [1st Dist.] 1995,

writ denied)). Further, the documentary evidence indicates that the source of the funds used to purchase shares in account #5798 was an asset transfer from account #7997. There were neither records nor testimony regarding the source of the funds in account #7997; therefore, the source of its funding, (separate property, community property, or a mixture of both) is left to conjecture. Since Everett failed to trace the initial purchase of shares in this account to his separate property by clear and convincing evidence, these shares are presumed to be community property, as would be additional shares derived from the reinvestment of dividends. *See Bahr v. Kohl*, 980 S.W.2d 723, 729–30 (Tex. App.—San Antonio 1998, no pet.).

However, Everett clearly traced $7,893.23 of the original $8,549.40 rolled over into account #4674 to the balance of his IRA existing on the date of his marriage to Dochia. He also clearly traced $103,559.16 of the $143,139.53 which was later rolled over into that account to the balance of his 401(k) on the date of their marriage. Dochia does not dispute that these amounts were his separate property. However, Dochia contends that the increases in the balances of Everett's IRA and 401(k) on the dates of the rollover are presumed to be community property since Everett failed to trace or explain the source of the increases of these accounts. We agree. Since Everett provided no evidence regarding the source in the increase in value of these accounts, the community property presumption would prevail to characterize the increase as community property despite the fact that some of it may have simply been due to the enhanced value of some of the assets within the fund. Thus, the initial contributions to account #4674 contained both community property ($40,236.54) and Everett's separate property ($111,452.39).

9

Everett and Stout testified and provided documentary evidence regarding the additions and withdrawals from account #4674 until October 5, 2005. The additions included some small annual contributions and dividend reinvestments. Other than the annual management fee that was assessed, Everett's uncontroverted testimony was that the withdrawals were for living expenses and taxes associated with the early withdrawal. Although Everett did not produce account records for account #4674 for 2004, he did introduce a summary prepared by Dochia for that account showing its value at the beginning of 2004 to have been $172,387.09, a contribution of $3,000.00, and the account value at the end of 2004 to have been $207,239.75. Stout testified that this accurately summarized the accounts in his records. However, he also testified that there are no records showing what dividends or other additions or withdrawals occurred in 2004. Since it is presumed that community property was withdrawn first, however, and since there is no evidence that the value of account #4674 ever dropped below the amount of the original separate property contribution, Everett showed that his original separate property contribution was untouched as of October 5, 2005, when account #4674 was closed.

Further, the records of the accounts show that the assets of account #4674 were transferred to Oppenheimer funds account #4267 on October 5, 2005. On that date, the account had a value of $172,227.74. On July 12, 2006, the records show that the assets of account #4267 were transferred to purchase 9,593.123 shares of Oppenheimer fund account #0449. Although no records of account #4267 were in evidence, Stout's uncontroverted testimony was that the money used to purchase shares in account #0449 originated from Everett's previously existing 401(k) and IRA accounts. Further, the summary of the account prepared by Dochia shows no

10

withdrawals for the October 5, 2005, to July 12, 2006, period. The annual summary for 2006 shows that on December 31, 2006, the value of account #0449 was $212,486.92. Both Stout's testimony and the records then trace the assets in account #0449 through several other accounts and, finally, in 2010, to account #5798 and account #5934. Testimonial and documentary evidence also show the natures and sources of the additions to these accounts. Everett testified (and documentation affirms) that withdrawals from these accounts were used to pay living expenses, to make a down payment on a community property farm, and to make monthly payments on the farm's mortgage. The records show that the value of these funds never went below Everett's original separate property contribution.

Everett testified that in April 2013, he rolled over $200,000.00 of the assets in account #5798 and account #5934 into American Equity policy number 1968, Great American policy number 7656, and Great American policy number 7711 and used the rest to pay his attorneys and other expenses related to the divorce. Everett further testified that these policies remained active at the time of trial. Again, since community assets are presumed to have been withdrawn first, before any separate funds are withdrawn, and since there were at all times sufficient funds in the accounts containing separate property funds to cover Everett's separate property balance, $111,452.39 of the $200,000.00 used to purchase the American Equity and Great American policies was Everett's separate property. Therefore, we hold that there was sufficient evidence to support the jury's finding and the trial court's judgment that these policies were owned fifty-six percent by Everett as separate property and forty-four percent as community property of the marriage.

11

Nevertheless, Dochia asserts that because there are gaps in the documentary evidence, Everett cannot take advantage of the community-out-first presumption. However, gaps in the documentary evidence may be overcome by testimony from a person with knowledge. *See Newland v. Newland*, 529 S.W.2d 105, 107–08 (Tex. Civ. App.—Fort Worth 1975, writ dism'd). Here, any gaps in the paper records were adequately filled by the testimony of Everett's account representative, Stout. As in *Newland*, Everett has supplied account records and other documentary evidence for the great majority of the fifteen years involved in this case. Finally, Everett testified that the American Equity and Great American policies were active at the time of trial and successfully traced a portion of the monies used to purchase these policies to his separate property, thus, discharging his burden. We overrule Dochia's point of error.

We affirm the judgment of the trial court.


Bailey C. Moseley
Justice

Date Submitted:     January 9, 2015
Date Decided:       February 3, 2015

12