

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-21-00013-CV

IN THE MATTER OF THE MARRIAGE OF
MICHAEL NASH AND TEXIE NASH

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 17-0526

Before Morriss, C.J., Stevens and Carter,* JJ.
Opinion by Justice Stevens

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

# O P I N I O N

Michael Nash appeals the trial court's final divorce decree dissolving his marriage to Texie Nash. On appeal, Michael challenges the trial court's characterization of fourteen pieces of property as community assets. We find that the trial court properly characterized thirteen of the disputed properties as community property but sustain Michael's point of error relating to the characterization of a property known as the "Loop and 59 tract." Because the Loop and 59 tract should have been characterized as Michael's separate property, we reverse the portion of the trial court's order setting forth its property division and remand the matter to the trial court for further proceedings consistent with this opinion. We sever the portion of the trial court's decree granting the parties' divorce and affirm that portion of the trial court's judgment.

## I.     Factual Background

Michael and Texie were married on August 6, 1997. Because Texie had inherited and acquired a sizeable estate prior to the marriage, the couple executed a premarital agreement (PMA).[1] The PMA, further discussed in detail below, included a list of Michael's and Texie's separate property assets at the time of the marriage and contained a provision stating that wages earned during marriage would remain separate property. The PMA also contemplated the creation of community property and included a provision establishing joint bank accounts.

The evidence at trial established that the couple's assets were a source of some marital discord. Michael had incorporated a business just prior to the marriage, which struggled financially for the first few years. Texie loaned substantial sums of money to the company, and

---

[1]"A premarital agreement becomes effective on marriage." TEX. FAM. CODE ANN. § 4.004.

an expert witness testified that most of the couple's income during the first several years of marriage, as reported on their income tax returns, came from Texie's separate property. In the early 2000s, Michael purchased several properties during a time when Texie believed he did not have sufficient income to do so. Texie said that she gave her separate property to Michael because she believed he had insufficient income.

The couple had separated and filed for divorce several times before this divorce. Michael first filed for divorce in 2002, but the couple reconciled at the beginning of 2003. Texie filed for divorce in 2006, but it was dismissed that same year after reconciliation. Texie testified that Michael agreed to give her a fifty-percent interest in his business to demonstrate his renewed commitment to the marriage, and Michael's company was converted into a limited partnership, Nash Trucking & Construction, Ltd., naming Texie a fifty-percent limited partner. The business grew, and the couple acquired additional assets.

Michael purchased several properties between 2000 and 2011 that were deeded only to him. According to Texie, Michael told her that her name was not required on documents attached to real property acquisitions unless they sold the property. Texie believed that she had an interest in those properties because funds other than Michael's separate property had been used to acquire them. The record showed that evidence of tracing, as detailed below, was largely lacking. The couple had numerous checking accounts, and Texie testified, "Money's been tossed back and forth so many times, it's hard to keep up with what went where." Expert testimony indicated that several of the couple's bank accounts had been commingled.

3

Another separation occurred in 2012 that undisputedly impacted the couple's financial relationship. Michael said that, after 2012, he and Texie discussed their assets, including commingled accounts and the business, "more collectively because . . . [they] had kind of gotten past that mine and yours and his and her stuff, and that's how [they] were getting along." He continued, "We were buying property together, so that . . . actually became and [was] going to be our property rather than how it had always been." Michael admitted that he and Texie had commingled some accounts in 2012, but Chad Maddux, a certified public accountant, testified that he believed the parties had commingled funds before then.

The trial court granted the divorce and characterized the parties' numerous assets. In a section labeled "*Division of the Marital Estate*," the trial court awarded to Michael the following community property: (1) six tracts of real property; (2) five personal vehicles; (3) three closely held businesses; (4) three business trucks; (5) a motor home; (6) three all-terrain vehicles; (7) a moped; (8) a golf cart; (9) two boats; (10) two Wave Runners; (11) five four-wheelers; (12) a wagon; (13) nineteen tractors or trailers; (14) twenty-one items in the category of equipment and tools; (15) three hundred head of cattle; (16) six horses; (17) two life insurance policies; (18) a one-percent community interest in a promissory note obtained after the sale of Nash Trucking & Construction, Ltd.; (19) fifty percent of twenty-six gas, oil, and mineral interests; and (20) 2,500 shares of stocks, bonds, and securities, among other things. Michael was also ordered to pay all debts incurred solely by him. Texie received the following community property: (1) eleven tracts of real property; (2) three items labeled as equipment and tools; (3) one vehicle; (4) a 7230 tractor and John Deere tractor; (5) a pontoon boat; (6) any life insurance policy insuring her life;

4

(7) fifty percent of twenty-six gas, oil, and mineral interests; (8) 2,500 shares of stocks, bonds, and securities; and (9) $52,800.00 pursuant to an order holding Michael in contempt for violating court orders during the pendency of the divorce. To equalize the division of community property, the trial court ordered Michael to pay Texie $198,725.69.

No findings of fact or conclusions of law were requested or filed. On appeal, Michael argues that the trial court erred by failing to find that the following property was his separate property: (1) the Grubb Pottery Warehouse tract; (2) Homestead I; (3) Homestead II; (4) Homestead III; (5) the Loop and 59 tract; (6) the Post Ranch tract I; (7) the Post Ranch tract II; (8) the Caddo Lake lots; (9) the Nash Trucking and Construction note; (10) the Brown tract; (11) the T&P FCU savings account; (12) the John Deere 6150R tractor; (13) the 7230 cab tractor and loader; and (14) the 1996 Caterpillar 416 backhoe.

## II. Thirteen of the Fourteen Items of Property at Issue Were Properly Characterized

### A. Standard of Review

"The Texas Family Code requires the trial court to divide a marital estate in a 'just and right' manner, considering the rights of the parties." *In re Marriage of Moncey*, 404 S.W.3d 701, 706 (Tex. App.—Texarkana 2013, no pet.) (quoting TEX. FAM. CODE ANN. § 7.001). "Trial courts can only divide community property, and the phrase 'estate of the parties' encompasses the community property of a marriage, but does not reach separate property." *Id.* (quoting *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011) (per curiam)).

"Property possessed by either spouse during or on dissolution of marriage is presumed to be community property." TEX. FAM. CODE ANN. § 3.003(a). To rebut this presumption, the

5

person seeking to prove the separate character of the property must do so by clear and convincing evidence. TEX. FAM. CODE ANN. § 3.003(b). Separate property is the property owned before marriage as well as "property acquired . . . during marriage through gift, devise, or descent." TEX. FAM. CODE ANN. § 3.001. All other property that is not separate property is community property. TEX. FAM. CODE ANN. § 3.002. "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. "Any doubt as to the character of property should be resolved in favor of the community estate." *In re Marriage of Moncey*, 404 S.W.3d at 706 (citing *Garza v. Garza*, 217 S.W.3d 538, 548 (Tex. App.—San Antonio 2006, no pet.)). "Reversible error exists as a matter of law only if the trial court characterizes property as community property and awards it to one spouse when it is established as the separate property of the other spouse." *Id.* (citing *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977)).

That said, characterization of marital property often involves questions of fact. *Maldonado v. Maldonado*, 556 S.W.3d 407, 414 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("Whether property is separate or community in nature is a mixed question of law and fact."); *Irvin v. Parker*, 139 S.W.3d 703, 708 (Tex. App.—Fort Worth 2004, no pet.) ("Whether the presumption as to the community character of marital property is overcome is a question for the jury." (quoting *Smith v. Lanier*, 998 S.W.2d 324, 332 (Tex. App.—Austin 1999, pet. denied) (citing *Orrill v. Orrill*, 271 S.W.2d 173, 175–76 (Tex. App.—Texarkana 1954, no writ)))); *Callaway v. Clark*, 200 S.W.2d 447, 449 (Tex. App.—Texarkana 1947, writ ref'd) ("[T]estimony

6

raised a question of fact as to whether the property was paid for with separate or community funds, and was properly submitted to the jury by the trial court."). Because no findings of fact and conclusions of law were requested or filed, "'we imply all findings of fact necessary to support the judgment' of the trial court." *Bouknight v. Bouknight*, No. 06-14-00034-CV, 2014 WL 4930818, at *2 (Tex. App.—Texarkana Oct. 2, 2014, pet. denied) (mem. op.) (quoting *Burden v. Burden*, 420 S.W.3d 305, 307 (Tex. App.—Texarkana 2013, no pet.)) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)). "When faced with conflicting evidence, the fact-finder may choose which witnesses to believe and may resolve inconsistencies in any witness' testimony." *Id.* (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)). As a result, "[w]e do not interfere with the fact-finder's resolution of conflicts in the evidence or its determination of the weight and credibility of witness testimony, as its determinations on these matters are generally considered conclusive." *Id.*

## B. Impact of the PMA on Our Analysis

As a preliminary issue, we must first address Michael's argument that the PMA removes the application of the community property presumption for property acquired after the marriage. To evaluate this claim, we look to the language of the PMA.

"[G]enerally, in Texas, courts interpret premarital agreements like other written contracts." *Matter of Marriage of I.C. & Q.C.*, 551 S.W.3d 119, 122 (Tex. 2018) (quoting *Williams v. Williams*, 246 S.W.3d 207, 210 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Beck v. Beck*, 814 S.W.2d 745, 748–49 (Tex. 1991) (using the terms "premarital agreement" and "contract" interchangeably))). "The interpretation of an unambiguous contract is

7

a question of law for the court." *Id.* (citing *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999)). "When interpreting a contract, our 'primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument. Objective manifestations of intent control,' not the subjective intent of the parties." *Id.* (quoting *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763–64 (Tex. 2018)).[2]

"One important distinction does exist between the construction of premarital agreements and normal contracts. Premarital property agreements we construe narrowly in favor of the community estate." *Williams v. Williams*, 246 S.W.3d 207, 211 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Fischer-Stoker v. Stoker*, 174 S.W.3d 272, 278–79 (Tex. App.–Houston [1st Dist.] 2005, pet. denied); *McClary v. Thompson*, 65 S.W.3d 829, 837 (Tex. App.—Fort Worth 2002, pet. denied)); *see In re Marriage of McNelly*, No. 14-13-00281-CV, 2014 WL 2039855, at *2 (Tex. App.—Houston [1st Dist.] May 15, 2014, pet. denied) (mem. op.); *Mora v. Mora*, No. 04-10-00832-CV, 2012 WL 1721540, at *1 (Tex. App.—San Antonio May 16, 2012, no pet.) (mem. op.) (citing *McClary*, 65 S.W.3d at 837)). "Not all premarital agreements remove the couple's entire marital estate from Texas' community property laws." *In re Works*, 118 S.W.3d 906, 909 (Tex. App.—Texarkana 2003, orig. proceeding). "Some premarital agreements . . . only purport to remove certain items of the marital estate . . . from the community property laws." *Id.* at 909–10.

---

[2]"Unless the contract indicates that the parties used a term in a technical or unusual sense, contractual terms are given their plain, ordinary, and generally accepted meaning." *Matter of Marriage of I.C. & Q.C.*, 551 S.W.3d at 122 (citing *Dynegy Midstream Servs. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).

Michael and Texie's PMA recited the "intent[] to list and define the separate property each party [was] bringing into the marriage and to preserve the separate character of such property after their marriage for all purposes, including but not necessarily limited to, accounting, liabilities, and ownership." The PMA included exhibit lists of Michael's and Texie's separate property. Michael's seven-item list of separate property included a "1996 Backhoe" with an estimated $45,000.00 value, four trailers, one vehicle, and an East Texas National Bank account with $10,000.00 beginning with numbers 107. Texie's separate property included many "Oil and Gas Mineral Interests" and sizeable bank accounts, among other things. Based on our narrow construction, and in line with the parties' intent to list and define the separate property each party was bringing into the marriage, we find that the phrase "separate property" in the PMA was limited to the lists of separate property specified in the PMA exhibit lists.

In the PMA, Michael and Texie agreed that increases in value and mutations generated from each party's separate property would be the separate property of the spouse who owned it prior to the marriage and that all wages and salaries earned by a spouse would be the separate property of the spouse. They also stipulated that, if both of their names were "placed on an account that [was] otherwise the separate property of one of the Parties, it [was] for management purposes only and . . . [would] remain the separate property of the owner-spouse."

Even so, the PMA contemplated the creation of community property. It specifically provided that Michael and Texie would "maintain a joint account . . . into which they [would] deposit funds from time to time . . . [to] be used to pay household expenses and such other expenses" as they agreed. According to the PMA, this account would "be owned as community

9

property between the Parties." As for debts, Michael and Texie agreed that "all liabilities and obligations . . . exist[ing] at the date of their marriage or . . . incurred . . . subsequent to their marriage [would] be enforceable against and discharged from the separate property of the Party who incurred the liability or obligation or from the community property subject to that Party's sole management, control, and disposition."

Under the PMA, Michael and Texie would also have the right to transfer or convey property to the other party, and the PMA provided that neither of them intended "to limit or restrict the right and power to receive any such transfers or conveyances from the other Party." Yet, "[t]he commingling by one Party of his or her separate funds or property with the separate funds or property of the other Party," oral statements of a party, and "[t]he way title [was] held on either Party's separate property" could not be considered evidence of any intent to change a separate property interest into community property.

Because the PMA contemplates that the parties could create community property, we find that it does not expressly negate the application of the presumption outright. Instead, it established the separate property that the parties had prior to the marriage and, as applicable here, exempted the following categories of property acquired after marriage from being considered community property: wages and salary, increases in value and mutations generated from separate property listed in the PMA, and bank accounts that were listed in the PMA as separate property and were not joint accounts as contemplated by the PMA. As a result, two obvious principles govern our analysis of the characterization of the assets at issue. First, property acquired before marriage is separate property unless it was used to maintain a joint

10

account as contemplated by the PMA. Second, property acquired after marriage is presumed to be community property, but the presumption will be rebutted by clear and convincing evidence if it falls into the category of items exempted from being considered community property under the PMA.[3]

## C. General Rules Governing Characterization of Property

"We determine whether property is separate or community by its character at the time of inception." *Marriage of Taylor*, No. 06-14-00061-CV, 2015 WL 428121, at *3 (Tex. App.—Texarkana Feb. 3, 2015, no pet.) (mem. op.) (citing *Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex. 2001)). "Inception of title occurs when a party first has a right of claim to the property by virtue

---

[3]Texie argues that Michael's appeal is barred by the acceptance-of-benefits doctrine because Michael argues that the PMA "does away with community property for these spouses," while accepting the benefits of community property awarded to him under the divorce decree. The estoppel-based acceptance-of-benefits doctrine "precludes a party from 'first adopting [a] judgment as right, and then repudiating it as wrong, [so as to take] advantage[] of its being both right and wrong.' Estoppel prevents litigants from taking contradictory positions as a means of gaining an unfair advantage from the inconsistency." *Kramer v. Kastleman*, 508 S.W.3d 211, 217 (Tex. 2017) (quoting *Matlow v. Cox*, 25 Tex. 578, 580–81 (1860)).

> [B]efore denying a merits-based resolution to a dispute, courts must evaluate whether, by asserting dominion over assets awarded in the judgment under review, the appealing party clearly intended to acquiesce in the judgment; whether the assets have been so dissipated as to prevent their recovery if the judgment is reversed or modified; and whether the opposing party will be unfairly prejudiced.

*Id.* We do not find those requirements met here. Michael demonstrated at trial that he and Texie agreed to establish community property after 2012. While Michael's brief does state that the PMA "*practically speaking*, . . . does away with community property," (emphasis added), we interpret that as an argument that the PMA does away with a community property presumption with respect to the disputed properties. At a post-judgment hearing, Michael testified that he had received the benefit of the community property awarded to him under the divorce decree. Even so, "merely using, holding, controlling, or securing possession of community property awarded in a divorce decree does not constitute clear intent to acquiesce in the judgment and will not preclude an appeal absent prejudice to the nonappealing party." *Id.* at 228. Michael also testified that he was not asking the trial court to enforce the property division and was waiting for the appeal to determine the proper characterization of the disputed assets. Also, a review of ten non-exhaustive factors listed in *Kramer* does not lead to the conclusion that the appeal should be barred. *See id.* at 228–29. Because Michael's actions are not inconsistent with his claims of error on appeal and, when possible, "an adjudication on the merits is preferred in Texas," we find that the acceptance-of-benefits doctrine does not bar this appeal. *Id.* at 227 (quoting *Sutherland v. Spencer*, 376 S.W.3d 752, 756 (Tex. 2012) (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 86 (Tex. 1992))); *see Matter of Marriage of A.W.E. & D.M.F.N.*, No. 05-19-01303-CV, 2021 WL 822492, at *3, *5 (Tex. App.—Dallas Mar. 4, 2021, no pet.) (mem. op.).

of which title is finally vested." *Id.* (quoting *Zagorski v. Zagorski*, 116 S.W.3d 309, 316 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)). "Further, to overcome the community property presumption, the spouse claiming property as separate 'must clearly trace the original separate property into the particular assets on hand during the marriage.'" *Id.* (quoting *Cockerham v. Cockerham*, 527 S.W.2d 162, 167 (Tex. 1975)). "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Id.* (quoting *Zagorski*, 116 S.W.3d at 316; *In re Marriage of Parker*, 997 S.W.2d 833, 837 (Tex. App.—Texarkana 1999, pet. denied)). "Even though the separate property may go through a series of exchanges, it will retain its separate character if the party can trace the assets on hand during the marriage to property that was separate when first acquired." *Id.* (citing *Celso v. Celso*, 864 S.W.2d 652, 654 (Tex. App.—Tyler 1993, no writ) (citing *Cockerham*, 527 S.W.2d at 167)).

### D.     Characterization of the Disputed Property

We place the disputed properties into three categories. The first category involves properties purchased during the marriage with funds from bank accounts that Michael argues were solely his separate property, but Texie argues were commingled. The properties purchased using these disputed accounts include the Grubb Pottery Warehouse tract, the Homestead properties, the Loop and 59 tract, the Post Ranch tracts, and the Caddo Lake lots, and their proper characterization requires us to first review the nature of the disputed accounts. The second category of properties, comprised of the Nash Trucking and Construction note and the Brown tract, requires a review of the characterization of the business. The third category of

12

properties, which does not involve preliminary issues, is comprised of the T&P FCU savings account, the John Deere 6150R tractor, the 7230 cab tractor and loader, and the 1996 Caterpillar 416 backhoe.

### 1. Characterization of Properties Purchased During the Marriage with Funds from the Disputed Bank Accounts

### a. Review of the Parties' Bank Accounts

"A party seeking to rebut the community presumption must trace the assets on hand during the marriage back to property that is separate in character." *In re Marriage of Born*, No. 06-08-00066-CV, 2009 WL 1010876, at *2 (Tex. App.—Texarkana Apr. 16, 2009, no pet.) (mem. op.) (citing *Cockerham*, 527 S.W.2d at 167; *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex. App.—Fort Worth 2004, no pet.)). "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Id.* (citing *Boyd*, 131 S.W.3d at 612); *see Robles v. Robles*, 965 S.W.2d 605, 614 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). "[C]onclusory or uncorroborated testimony that funds are separate property is insufficient to rebut the community presumption, unless there is also evidence that traces the funds." *In re Marriage of Born*, 2009 WL 1010876, at *5; *see Robles*, 965 S.W.2d at 614 ("Mere testimony that the property was purchased with separate funds, without any tracing of the funds, is generally insufficient to rebut the presumption." (citing *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex. App.—Houston [1st Dist.] 1995, writ denied))). Even the designation of a bank account as separate property in a premarital agreement does not overcome the community property presumption without proper

13

evidence of tracing. *Osorno v. Osorno*, 76 S.W.3d 509, 512 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

"The burden of tracing is a difficult, but not impossible, burden to sustain." *In re Marriage of Born*, 2009 WL 1010876, at *2. "Courts have no difficulty in following separate funds through bank accounts." *Id.* at *3. "A showing of community and separate funds existing in the same account does not divest the separate funds of their identity and establish the entire amount as community, if the separate funds may be traced and the trial court is able to determine accurately the interest of each party." *Id.* (citing *Holloway v. Holloway*, 671 S.W.2d 51, 60 (Tex. App.—Dallas 1983, writ dism'd)). That said, "[i]f separate property and community property have been so commingled as to defy resegregation and identification, the statutory presumption of community property prevails." *Id.* at *2.

Texie testified that she and Michael had numerous checking accounts during the marriage and that money had "been tossed back and forth so many times, [it was] hard to keep up with what went where." A review of the parties' numerous bank accounts necessarily impacted the trial court's characterization of properties acquired using funds kept in those accounts. As a result, we discuss the disputed bank accounts that were used to purchase real property after the marriage.

### i. The Panola National Bank Account

Texie testified that she and Michael banked at Panola National Bank (the Panola Account). When asked, "Did ya'll bank at Panola National Bank and have a joint account at Panola National Bank that nobody has produced any statements for," Michael responded,

14

"Exactly. I told you I do not remember." While both parties stated that they were unable to obtain any records for this bank account, Texie and her expert CPA, Chad Maddux, testified that a review of a Merrill Lynch bank account that was undisputed as Texie's separate property showed that her separate property funds were deposited into the Panola Account between 1998 and 2001. Michael did not remember the account, but Texie testified that Michael had deposited money into it. While there was no testimony as to when this account was created, the Panola Account was not listed on the PMA and was presumed to be created after the marriage. On these facts, the trial court could have determined, based on Texie's testimony, that the account was a community joint account as contemplated by the PMA.[4]

### ii.    The Austin Bank Account

Texie and Michael had a bank account at Austin Bank with an account number ending in 179 (the Austin Account). The Austin Account was created after the marriage. Evidence at trial showed that both parties' names were on the account and that they both deposited separate property funds into it. Michael signed an affidavit opining that the Austin Account was not a community account, but instead "held the separate funds of both of [them] per the terms of the [PMA]." Yet, it is undisputed that no tracing for this bank account was available.

After reviewing the Austin Bank records that were available and comparing them to Michael's tax returns, Maddux testified that there were deposits into the Austin Account that were neither wages nor salary. Michael said that he "[p]ossibly" earned more than what he had reported to the Internal Revenue Service (IRS), and there was evidence of sources of income that

---

[4]Michael does not argue otherwise in his briefing.

were not increases in value or mutations generated from separate property, such as gambling winnings, sales of cattle, and rental income. Michael admitted that rental income from property purchased after the marriage may have been deposited into the Austin Account at some point.

Doug Fejer, a CPA who served as Michael's own expert, testified that, in the absence of appropriate records that could be used to trace the source of the funds deposited into the account, the Austin Account was presumed to be community property. When a trial court is left to speculate, based on testimony and spotty records, what part of an account is original separate-property principal and what part is community, the community presumption prevails. *In re Marriage of Born*, 2009 WL 101087, at *7. Considering this evidence, the trial court could have found that the Austin Bank account had been commingled, and Michael does not argue otherwise.

### iii. The Texas National Bank Accounts

In 2006, Michael testified that he moved his banking business to Texas National Bank and created three accounts with account numbers ending in 127 (the 127 Account), 761 (the 761 Account), and 660 (the 660 Account). Both Texie's and Michael's names were on the 761 Account. Maddux testified, and Michael admitted, that the 761 Account had been commingled.

There was no evidence establishing the source of the income used to open the 127 Account or the 660 Account, and Michael admitted that he produced no statements showing any kind of tracing for those accounts during the relevant timeframe. However, he believed they were his separate property. The 127 Account and the 660 Account bore only Michael's name. Even so, Maddux testified that the money deposited into those accounts exceeded what Michael

16

had reported as his income, and Michael admitted that he may have earned more than what he reported to the IRS. As an example, Michael deposited thousands of dollars into the 127 Account from sales of cattle and rental income. Michael's expert, Fejer, conceded that those deposits were community funds because the PMA did not expressly list those sources of income as separate property. Because the funds were commingled, Fejer agreed that the community presumption applied to the 127 Account. Michael admitted that, in 2010, he deposited rental income into the 660 Account, and Maddux testified that the 660 Account was commingled as well.

Michael's testimony that the 127 Account and the 660 Account were separate property constituted insufficient evidence to rebut the community presumption that these accounts, created after marriage, were community property. *See id.* at *5; *Robles*, 965 S.W.2d at 614. As a result of "incomplete documentary, and less-than-compelling oral, evidence tracing the account from its presumed status as community property, during the marriage, to [Michael's] separate property, before the marriage," Michael "failed to accurately segregate the separate and community property interests." *Born*, 2009 WL 1010876, at *7. The trial court properly characterized the Texas National Bank Accounts as commingled, community property.

### b. The Grubb Pottery Warehouse Tract

The trial court awarded the Grubb Pottery Warehouse tract (Grubb), which was purchased by Michael in 2005, to Texie. The evidence at trial showed that Michael alone entered into an earnest money contract and paid $5,000.00 in earnest money. Texie testified that she claimed ownership in Grubb because a portion of the money used to purchase the tract came

17

from the sale of another property that was purchased from a $50,000.00 inheritance from her grandmother. A $66,880.00 deposit that was not classified as wages or salary, and could not be traced by Michael, was deposited in the Austin Account bearing both parties' names.[5] A $52,977.98 cashier's check was written on the Austin Account and used to make a down payment on Grubb. The remainder of Grubb's $400,000.00 purchase price was financed by Texas National Bank.

Michael alone signed the promissory note, and only his name was included on the deed to Grubb, but Texie signed the deed of trust securing the remaining funds used to purchase Grubb. Texie testified that she did not realize that Michael planned to keep Grubb as his separate property and believed that her money contributed toward its purchase. Texie and Maddux both testified that there was no tracing for the Austin Account that was used to purchase Grubb.

Because it was acquired after the marriage, Grubb was presumed to be community property, and it was Michael's burden to rebut that presumption by clear and convincing evidence. Citing to *Weirzchula v. Weirzchula*, 623 S.W.2d 730, 732 (Tex. App.—Houston [1st Dist.] 1981, no pet.), Michael argues that the inception-of-title rule required the trial court to find that Grubb was his separate property because he alone entered into the earnest money contract. Even so, *Weirzchula* is easily distinguishable since the husband in that case "entered into an earnest money contract while he was still a single man." *Id.* Here, Michael entered into the earnest money contract during the marriage, admits that he did not trace the source of the $5,000.00 in earnest money, and further admits that he did not trace the source of the down

---

[5]The amount of this deposit exceeded the parties' reported income for that tax year.

payment. Applying the inception-of-title rule, Grubb was purchased after the marriage, the earnest money payment and down payment came from funds that were presumed to be community property, and Michael failed to trace those funds to establish that they came from his separate property. *See Matter of Marriage of Collinsworth*, 598 S.W.3d 357, 364 (Tex. App.— Texarkana 2020, no pet.).

Next, Michael argues that his name alone was on the deed, but "[t]he community presumption is not contradicted by legal title in just one spouse." *Tipps v. Chinn Expl. Co.*, No. 06-13-00033-CV, 2014 WL 4377813, at *2 (Tex. App.—Texarkana Sept. 5, 2014, pets. denied) (mem. op.) ("'Where the grant or deed to community lands is in the name of the husband, the legal title to the lands is in him.' But legal title in the husband's name does not, alone, alter the community nature of the property, and the wife still can have an equally absolute estate or interest in the property." (quoting *Burnham v. Hardy Oil Co.*, 195 S.W. 1139, 1143 (Tex. 1917))).

Even so, Michael attempts to prove the separate character of the property by arguing that Texie was not liable on the debt he incurred to purchase Grubb. Michael acknowledges that property purchased on community credit is community property. *See Puente v. Puente*, No. 01-19-00952-CV, 2021 WL 1414218, at *5 (Tex. App.—Houston [1st Dist.] Apr. 15, 2021, no pet.) (mem. op.) (citing *Cockerham v. Cockerham*, 527 S.W.2d 162, 171 (Tex. 1975) ("It is well established that debts contracted during marriage are presumed to be on the credit of the community and thus are joint community obligations, unless it is shown the creditor agreed to look solely to the separate estate of the contracting spouse for satisfaction.")); *Mock v. Mock*, 216

19

S.W.3d 370, 374 (Tex. App.—Eastland 2006, pet denied); *Jones v. Jones*, 890 S.W.2d 471, 475 (Tex. App.—Corpus Christi 1994, writ denied) ("Likewise, property purchased on credit during a marriage is community property unless there exists an express agreement on the part of the lender to look solely to the separate estate of the purchasing spouse for satisfaction of the indebtedness."). Yet, Michael contends that the PMA provided "that the debts of a spouse are payable from their separate property" and that, as a result, "the presumption of community credit [was] overcome by the fact that Michael alone was the party to the loan."

We do not agree with Michael's reading of the PMA, which provided that "all liabilities and obligations . . . [would] be enforceable against and discharged from the separate property of the Party who incurred the liability or obligation *or from the community property subject to that Party's sole management, control, and disposition*." (Emphasis added). The PMA, which contemplated purchases on community credit, did not alter the character of property acquired after marriage, but merely clarified the parties' liabilities for debts incurred by one spouse. *See Goyal v. Hora*, No. 03-19-00868-CV, 2021 WL 2149628, at *11 (Tex. App.—Austin May 27, 2021, no pet.) (mem. op.) (citing James W. Paulsen, *Acquiring Separate Property on Credit: A Review and Proposed Revision of Texas Marital Property Doctrine*, 37 St. Mary's L. J. 675, 676 (2006) (stating "apparent black letter rule" that "anything acquired by either spouse on credit during marriage is community property, unless the creditor agrees at the outset to look only to separate property for repayment," or put differently, "all property acquired on credit during marriage is community property, unless that property is acquired by a separate-property-secured non-recourse loan")); *see also Tedder v. Gardner Aldrich, LLP*, 421 S.W.3d 651, 655–54 (Tex.

2013); *Cockerham*, 527 S.W.2d at 171 ("[T]he fact that the debts are community liabilities would not, without more, necessarily lead to the conclusion they were joint liabilities. Characterization of the debts as community liabilities is only one aspect of the circumstances to be considered in determining whether the debts are joint."). In other words, the PMA's reference about how debts would be paid did nothing to change the community presumption, inception-of-title rule, or other applicable rules. Also, nothing in this case showed that Texas National Bank agreed to look solely to Michael's separate property assets to satisfy the obligation on the promissory note because Texie also signed the deed of trust, which listed "Michael Nash and Texie Nash, husband and wife" as grantors to the debt. *See Welder v. Welder*, 794 S.W.2d 420, 427–28 (Tex. App.—Corpus Christi 1990, no pet.) ("[T]he intention of one spouse alone to repay a loan out of separate funds and hold the property purchased with the proceeds of that loan as separate property has never been controlling . . . . [T]he intention of the lender to look solely to the property of one spouse is an evidentiary factor of prime importance in showing by clear and convincing evidence that the spouses intended to hold the property as one spouse's separate property, especially where there is no other evidence of such an agreement.").

Because it was purchased after the marriage, Grubb was presumptively community property. The funds used to purchase the property came from the Austin Account, which the evidence showed housed community funds and community credit. Because Michael failed to trace the source of the funds used to his separate property, and also failed to show that Texas National Bank agreed to look solely to his separate property funds in satisfaction of the debt

21

incurred, we find that the trial court did not err by concluding that Grubb was community property.

### c.        Homesteads I, II, and III

The trial court awarded three tracts of real property, known as Homestead tracts, I, II, and III, to Texie as a part of its just and right division of community property. To evaluate Michael's complaint that the trial court erred by failing to find that the Homestead properties were his separate property, we recite the facts involving each transaction.

In 2000, Michael found a piece of property, known as the Fitzgerald tract (Homestead I), and took Texie to see it. He claimed that Texie had no interest in the property but decided to purchase it anyway. Michael made the $48,000.00 down payment for the purchase of Homestead I in cash and could not remember where the money came from. Texie said that she could not remember if she provided Michael with any money to assist with the down payment but testified that they were both putting money into the Panola Account, which was the same account that was used to purchase Homestead I.

The remaining purchase price for Homestead I was financed through Panola National Bank. While only Michael executed the promissory note, Michael and Texie both signed a deed of trust naming them as obligors of the debt on the same day. Even so, the deed conveyed the property only to Michael.[6] Texie said that, although she never demanded that Michael add her to the deed, she believed that she owned the property from the beginning because they both visited it and discussed building a home there.

---

[6]The deed did not state whether Michael was married and did not contain any separate property recital.

22

A few years later, the parties decided to move their marital home in favor of building a new marital home on Homestead I. Michael and Texie borrowed $390,000.00 to construct the home, were both listed as grantors on the loan, and signed the deed of trust to secure the note.

Michael admits that he did not trace the source of funds used to make the down payment on Homestead I but claims that it was his separate property because the deed was in his name and he alone signed the promissory note. We disagree.

Because it was acquired after the marriage, Homestead I was presumptively community property. The community presumption was not contradicted simply because the deed contained his name alone. *See Tipps*, 2014 WL 4377813, at *2. Because nothing indicated that Panola National Bank agreed to look only to Michael's separate property to satisfy the note on Homestead I, the property was purchased using community credit. *See Puente*, 2021 WL 1414218, at *5 (citing *Cockerham*, 527 S.W.2d at 171); *Mock*, 216 S.W.3d at 374; *Jones*, 890 S.W.2d at 475; *Welder*, 794 S.W.2d at 427–28. On these facts, the trial court could find that Michael failed to rebut the community property presumption by clear and convincing evidence. As a result, the trial court properly concluded that Homestead I was community property.

As for Homesteads II and III, they were also purchased after the marriage and were paid for with cash that Michael admitted he could not trace. His expert, Fejer, testified that Michael did not make sufficient income as reported on tax returns to pay for Homesteads II and III. Texie testified that Michael had "taken a lot of our community money and separate property money and put his name only on things and claimed it as his own separate property," including the homestead properties. Although the deeds listed only Michael's name, that fact did not

23

operate to defeat the community presumption since Michael could not establish that his separate property was used to purchase the tracts. As a result, the trial court did not err in concluding that Homesteads II and III were community property.

#### d. The Loop and 59 Tract

Michael purchased the Loop and 59 Tract in 2006, which the trial court awarded to Texie. Michael paid $6,000.00 in earnest money from the 660 Account, transferred $65,000.00 over the phone from an unknown source into the 127 Account, and received a cashier's check from the 127 account to make a $33,603.65 down payment. No evidence tracing the source of the funds used to pay for the tract was introduced into evidence, but Texie testified, "Some of our community property has gone into [the Loop and 59 Tract]."

Michael maintained that the Loop and 59 Tract was his separate property. Michael alone signed a promissory note for $195,000.00 for the remaining balance.[7] While the deed of trust securing the note was signed by both Michael and Texie, who were both listed as grantors, it listed only Michael as the borrower. The deed to the Loop and 59 Tract named only Michael and provided that the tract was conveyed to him, "a married man, as his sole and separate property and not joined in . . . by his spouse as [the] property constitute[d] no part of his homestead."

"Although we begin with a community property presumption, 'a presumption of separate property arises where the instrument of conveyance contains a separate property recital.'" *Cardenas v. Cardenas*, No. 13-16-00064-CV, 2017 WL 1089683, at *2 (Tex. App.—Corpus Christi Mar. 23, 2017, no pet.) (mem. op.) (quoting *In re Marriage of Moncey*, 404 S.W.3d 701,

---

[7]Evidence at trial showed that payments on the note were made from the 660 Account.

24

712 (Tex. App.—Texarkana 2013, no pet.) (quoting *Roberts v. Roberts*, 999 S.W.2d 424, 431 (Tex. App.—El Paso 1999, no pet.))). "A 'separate property recital' is a recital in an instrument that the consideration comes from the separate property of a spouse or that the property is transferred to a spouse as the transferee's separate property or for the transferee's separate use." *Id.* (citing *Stearns v. Martens*, 476 S.W.3d 541, 547 n.4 (Tex. App.—Houston [14th Dist.] 2015, no pet.)). "Such a 'separate property recital' negates the community-property presumption and creates in its place a [generally] rebuttable presumption of separate property." *Id.* (quoting *In re Marriage of Moncey*, 404 S.W.3d at 712–13; *Magness v. Magness*, 241 S.W.3d 910, 912–13 (Tex. App.—Dallas 2007, pet. denied); *Roberts*, 999 S.W.2d at 432; *Kyles v. Kyles*, 832 S.W.2d 194, 196 (Tex. App.—Beaumont 1992, no writ)). "Thereafter, the spouse contending that the property is community property has the burden to defeat the separate property presumption." *In re Marriage of Moncey*, 404 S.W.3d at 712–13 (quoting *Sanders v. Sanders*, No. 02-08-00201-CV, 2010 WL 4056196, at *16 (Tex. App.—Fort Worth Oct. 14, 2010, no pet.) (mem. op.)).

The separate property deed recital here created a presumption that the Loop and 59 Tract was Michael's separate property. *See Seitz v. Seitz*, 608 S.W.3d 272, 278 (Tex. App.—Houston [1st Dist.] 2020, no pet.). While this presumption is generally rebuttable, the deed recital is conclusive if the other spouse is also a party to the transaction and cannot be rebutted in the absence of proof of duress, fraud, accident, or mistake. *Id.*; *see Weed v. Frost Bank*, 565 S.W.3d 397, 406 (Tex. App.—San Antonio 2018, pet. denied) (citing *Hodge v. Ellis*, 277 S.W.2d 900, 904–905 (Tex. 1955)). As a result, where a wife is a party to the transaction deeding property to a husband as his sole and separate property, the theory is that the wife has gifted her "interest in

25

community property through [her] consent and participation in the deed transaction." *Weed*, 565 S.W.3d at 403–04. A spouse that signs a deed of trust is considered a party to the deed transaction in the absence of proof of duress, fraud, accident, or mistake. *Hodge v. Ellis*, 277 S.W.2d 900, 904 (Tex. 1955). In such a case, "the result generally is to hold the property to be separate property of the [spouse listed on the deed], even though the consideration be community or from the separate estate of the [non-listed spouse], and even though the [non-listed spouse] on the trial denies that the purchase was by way of a gift of either to the [spouse listed on the deed]." *Hodge*, 277 S.W.2d at 904; *see Weed*, 565 S.W.3d at 404–06.

Texie points to the lack of tracing of the source of funds used to purchase the Loop and 59 tract and the evidence of commingling in the 127 Account and the 660 Account. Although this evidence could be considered if Texie were not a party to the deed transaction, she signed a deed of trust on a loan executed by Michael to secure property conveyed to him as his sole and separate property. Because Texie was a party to the deed transaction, the separate property recital deeding the Loop and 59 tract to Michael was conclusive. As a result, we find that the trial court erred in finding that the Loop and 59 tract was community property.

### e.    The Post Ranch Tracts

The trial court awarded properties known as Post Ranch I and Post Ranch II to Michael. Michael argues that both tracts were his separate property. We disagree.

Michael leased Post Ranch I between 2005 and 2006. Michael acquired Post Ranch I with the help of Tony Marsh, described as a middleman, in 2007. The seller, Jettie Evans Autrey, an elderly woman, deeded Post Ranch I to Michael and Marsh "as their sole and separate

26

property." The consideration for the purchase included a $80,000.00 cashier's check from the 127 Account as a down payment to Autrey and a $720,000.00 promissory note executed by Michael and Marsh to Autrey. On the same day, Marsh sold his interest back to Michael in exchange for $90,000.00 as a down payment from the 127 Account.[8] Michael later paid Marsh $434,265.00 in the form of a cashier's check drawn on the 127 Account.

Texie testified that she traveled with Michael to Autrey's home but was otherwise not a party to the transaction. The evidence at trial showed that the 127 Account was commingled with cattle sales and other deposits that were neither wages nor salary, and Michael agreed that there was no tracing of the account or evidence of the source of deposits into the 127 Account during that time. Texie testified that "part of [her] separate property and community property" had been used to make payments on Post Ranch I, and the evidence at trial showed that payments on Michael's promissory note were coming from the parties' joint 761 Account. According to Maddux's review of the 761 Account, $186,446.55 was paid to Autrey from community funds, $208,310.07 was paid using Texie's separate funds, and $124,110.20 was paid using Michael's separate funds. Even so, it was undisputed that the 761 Account was a joint account, and Maddux and Fejer both testified that the 127 Account was commingled and contained deposits exceeding Michael's income.

In November 2010, Michael purchased Post Ranch II from David Tyler. The deed from Tyler contained the recitation that Post Ranch II was conveyed to Michael "as his sole and separate property." Earnest money for the purchase came from the 660 Account, and the

---

[8]Michael also paid Marsh $15,000.00 in earnest money from the 127 Account.

27

purchase price was paid by cashier's check for $90,254.21 from the 127 Account. In addition to the evidence of commingling of the 127 Account, Michael admitted that, by 2010, the 660 Account contained rental income, and Maddux testified that the 660 Account was commingled as well.

Although the Post Ranch tracts were purchased after the marriage, the separate property deed recitals created a rebuttable presumption that the tracts were Michael's separate property. *See Cardenas*, 2017 WL 1089683, at *2; *In re Marriage of Moncey*, 404 S.W.3d at 712. Yet, because Texie was not a party to the deed transactions involving the Post Ranch Tracts, she only needed to "[p]resent[] some evidence to rebut the deed's recital's separate property presumption," and, if she did, "the burden shift[ed] back to [Michael] to prove that the property [was] actually separate property." *Weed*, 565 S.W.3d at 407 (citing *Hodge*, 277 S.W.2d at 906–07). In other words, if a spouse is not listed or otherwise involved in the deed transaction, "a third party grantor, not interested in the community one way or another, has no standing whereby to impose a particular character on the estate conveyed; so the recital in his deed may be regarded *merely as one of an existing fact, which may properly be disputed by evidence*." *Weed*, 565 S.W.3d at 405 (quoting *Hodge*, 277 S.W.2d at 905). "It is accordingly reasonable to say that in such a case, once there is adduced evidence of probative force tending to show the property to have been purchased with community funds, the question as to the status of the property is ordinarily one of fact." *Id.* (quoting *Hodge*, 277 S.W.2d at 905).

Evidence of "substantial amounts of the community type funds in relation to the amount of separate funds involved," "the large total consideration paid for the properties," and "the

28

absence of evidence as to other separate property that might have been employed" is sufficient to rebut the separate property presumption created by a deed recital by the spouse who did not participate in the transaction. *Id.* at 406 (quoting *Hodge*, 277 S.W.2d at 906–07). Here, Texie's evidence showing that the Post Ranch tracts were purchased using funds from joint and commingled accounts, the large purchase price of the tracts, and the lack of tracing of the 127 Account was sufficient to allow the fact-finder to conclude that the deed recital was overcome. *See id.* at 415. As a result, we do not find that the trial court erred by concluding that the Post Ranch tracts were community property. *See id.* at 413 (citing *Hodge*, 277 S.W.2d at 907).

### f. The Caddo Lake Lots

The trial court awarded to Texie the Caddo Lake lots, which Michael had purchased from John and Carla Doss in 2011 for $25,000.00. Michael paid $1,000.00 in earnest money, made a $5,000.00 down payment, and later obtained a cashier's check for the balance, all from the 127 Account. Michael testified that he did not trace the source of funds in the 127 Account. The deed from the Dosses recited that the Caddo Lake lots were conveyed to Michael "as his sole and separate property." Texie did not participate in the deed transaction. After the transaction, Michael testified that he and Texie used commingled funds from a joint account to build a cabin on one of the Caddo Lake lots.

Although the Caddo Lake lots were purchased after the marriage, the separate property deed recitals created a separate-property presumption that Texie could rebut because she was not a party to the transaction. *See Weed*, 565 S.W.3d at 407 (citing *Hodge*, 277 S.W.2d at 906–07); *Cardenas*, 2017 WL 1089683, at *2; *In re Marriage of Moncey*, 404 S.W.3d at 712. Here,

29

because Texie introduced evidence that the funds in the 127 Account were commingled, the separate-property presumption created by the deed recital disappeared, *Weed*, 565 S.W.3d at 412–13, and "the burden shift[ed] back to [Michael] to prove that the property [was] actually separate property." *Id.* at 407 (citing *Hodge*, 277 S.W.2d at 906–07). The deed recital itself was insufficient, and Michael introduced no evidence tracing the source of funds from the 127 Account. *See id.* at 415. As a result, we conclude that the trial court did not err in finding that the Caddo Lake lots were community property.

### 2. Characterization of Properties Involving the Business

#### a. The Nash Trucking and Construction Promissory Note

Nash Trucking & Construction, Inc. (the Company), was incorporated by Michael a few days before his marriage to Texie. The Company, which delivered rock to customers, was largely compensated in cash for services. Jo Joiner, an employee of the company, testified that she worked for the business from 1998 until 2016 and that it struggled financially for the first few years. The evidence at trial showed that Texie had made several sizable loans to the Company that were never repaid and totaled at least $200,000.00.[9] By the end of 2002, Joiner testified that Texie and Michael were separated, and Michael filed for divorce. According to Joiner, the couple reconciled in the beginning of 2003.

Joiner said that, in 2003, Texie "was given 50 percent" of the Company and that Michael told her she "became [a] 50 percent owner." Texie testified that, in an effort to reconcile the marriage, Michael told her, "I'm going to make you a partner." In 2003, the Company was

---

[9]Joiner testified that the company books reflected that it had repaid $40,000.00 to Texie, but she was unsure if the money was actually repaid.

converted into a limited partnership with Texie named as fifty-percent limited partner, Michael named as a forty-nine-percent limited partner, and a new company, Nash Management, L.L.C., named as a one-percent general partner. Texie testified that she understood she was a partner when she signed the agreement of limited partnership for Nash Trucking & Construction, Ltd. (Partnership). According to Texie, the Company's conversion to the Partnership and her acquisition of interest was made as "[Michael's] way to demonstrate his renewed commitment to [the] marriage." Thereafter, Texie said that Michael talked about the Partnership as if it was their business and that she believed the Partnership was their community property. Maddux testified that Texie owned fifty percent of the Partnership as separate property, that Michael owned forty-nine percent as his separate property, and that one percent belonged to the community estate.

Michael testified that the conversion of the Company was made only for franchise tax purposes. Fejer opined that the PMA provided that the separate property nature of the Company was not altered by the inclusion of Texie's name on the Partnership because it provided that "increases in value and[] mutations generated from each Party's respective separate property [would] be the separate property of the spouse who own[ed] the property" prior to the marriage. Even so, (1) the Company was never listed in the PMA as Michael's separate property, (2) the PMA provided that Michael and Texie would also have the right to transfer or convey property or other interests to the other party and that neither of them intended "to limit or restrict the right and power to receive any such transfers or conveyances from the other Party"; and (3) Fejer admitted that there was no requirement that Texie receive anything in the Company conversion.

31

Michael's accountant said that he wanted the conversion to be a limited partnership with a "general partner . . . set up as a single member LLC that we elected in to be an S-corp and then have the other 99 percent owned by Michael . . . but the documents got prepared with it being a 50/50 split." Dean Searle, the attorney who assisted with the conversion, testified that it was done to convert the Company to a limited partnership to avoid franchise tax, but that it was possible to complete the conversion without changing any ownership interest. Searle confirmed that Michael could have decided not to include Texie in the transaction.

Texie's daughter before the marriage, Leslie Lynn Weir, testified that she worked at the business, where she met her husband, Daniel Weir, who was also an employee. Leslie testified that Texie did not have daily obligations at the business. According to Joiner, the Weirs bought the Partnership from Michael and Texie in 2015. The agreement for sale of the Partnership said, "This agreement for sale is by and between Michael Nash and wife Texie Nash hereinafter referred to as Nash, a married couple." Michael and Texie both signed the document as sellers. In exchange, the Weirs made out the promissory note for $5,178,000.00 to both Michael and Texie. Even so, Leslie testified that she made out the checks on the promissory note to Michael.[10]

Texie argued that Michael had gifted her a fifty percent interest in the Partnership to reconcile their marriage. The trial court agreed. It found that the Partnership had been one percent community property, representing Nash Management, L.L.C.'s, ownership interest,

---

[10]Fejer, who was asked to assume that the PMA provided that the parties could change title to assets from one party to another without affecting the characterization of the property, opined that the Weirs' note was a mutation of the interest in the Company and would be Michael's separate property.

forty-nine percent Michael's separate property, and fifty percent Texie's separate property. As a result, it confirmed forty-nine percent of the sale proceeds of the Partnership secured by the Weirs' note payable as Michael's separate property, confirmed fifty percent of the sale proceeds as Texie's separate property, and awarded Michael the remaining one percent community interest in the sale proceeds.

On appeal, Michael argues that the PMA provided that "increases in value and[] mutations generated from each Party's respective separate property [would] be the separate property of the spouse who own[ed] the property" prior to the marriage. Because premarital agreements are construed "narrowly in favor of the community estate," *Williams*, 246 S.W.3d at 211, and "[a]ny doubt as to the character of property should be resolved in favor of the community estate," *In re Marriage of Moncey*, 404 S.W.3d at 706, we disagree with Michael. In the same operative paragraph as the provision on which Michael relies, the PMA provided that it was the intent of the parties to "list and define the separate property each party [was] bringing into the marriage and to preserve the separate character of such property after their marriage." To effectuate that intent, the parties created a list of separate property. As a result of our narrow construction of the PMA, the term "separate property," as used in the PMA, was limited to the list of each party's separate property, unless otherwise listed or defined in the PMA's language.[11] In other words, in the paragraph at issue, the parties agreed that mutations generated from the property listed in the PMA would be the separate property of the spouse who owned it prior to the marriage. Because the Company was not listed as a separate property asset under the PMA,

---

[11]For example, while not included on the list of separate property, the PMA included "wages and salaries" and income from separate property as separate property.

this provision of the PMA did not apply. Instead, the applicable provision was the one that stated, "[E]ither Party shall have the right to transfer or convey to the other Party any property or interest therein during his or her lifetime, and neither Party intends this agreement to limit or restrict the right and power to receive any such transfers or conveyances from the other Party."

Even so, Michael argues that the evidence did not establish a gift to Texie of the Partnership interest. We disagree. "A gift is a voluntary transfer of property to another made gratuitously and without consideration."[12] *In re Marriage of Moncey*, 404 S.W.3d at 710 (citing *Magness v. Magness*, 241 S.W.3d 910, 912 (Tex. App.—Dallas 2007, pet. denied); *Roberts v. Roberts*, 999 S.W.2d 424, 432 (Tex. App.—El Paso 1999, no pet.)). "A spouse may make a gift of separate property to the other spouse." *Magness v. Magness*, 241 S.W.3d 910, 912 (Tex. App.—Dallas 2007, pet. denied) (citing *Roberts*, 999 S.W.2d at 432). "Three elements are required to establish the existence of a gift: (1) intent to make a gift, (2) delivery of the property, and (3) acceptance of the property." *In re Marriage of Moncey*, 404 S.W.3d at 710 (citing *Magness*, 241 S.W.3d at 912; *Roberts*, 999 S.W.2d at 432). "[T]he intent must exist at the time of the transfer." *Id.* "Generally, the burden of proof rests on the person claiming the existence of a gift." *Id.* (citing *Roberts*, 999 S.W.2d at 432). "However, where the conveyance is from one spouse to the other spouse, there is a presumption of gift." *Roberts*, 999 S.W.2d at 432 (citing *Story v. Marshall*, 24 Tex. 305 (1859)); *see Rivers v. Rivers*, No. 03-17-00690-CV, 2018 WL 6626718, at *1 (Tex. App.—Austin Dec. 19, 2018, no pet.) (mem. op.) ("[W]hen one spouse uses separate funds to acquire property during marriage and takes title to that property in the

_____
[12]Michael's argument that Texie paid no consideration for her interest in the Partnership is consistent with the trial court's finding that it was a gift.

34

names of both spouses, a presumption arises that the purchasing spouse intended to make a gift of one half of the separate funds to the other spouse." (citing *Smith v. Strahan*, 16 Tex. 314, 322 (1856))); *Pearson v. Pearson*, No. 03-13-00802-CV, 2016 WL 240683, at *6 (Tex. App.—Austin Jan. 15, 2016, no pet.) (mem. op.) ("Interspousal transfers are presumed to be a gift and, thus, the separate property of the recipient spouse." (citing *In re Marriage of Morrison*, 913 S.W.2d 689, 692 (Tex. App.—Texarkana 1995, writ denied))). That presumption, however, may be rebutted by evidence clearly establishing that there was no intention to make a gift. *Cockerham*, 527 S.W.2d at 168 (citing *Strahan*, 16 Tex. at 324); *Pearson*, 2016 WL 240683, at *6.

We begin with the assumption that Michael established that the Company was his separate property. Texie testified that, in 2003, Michael gave her an interest in the business to reconcile their marriage. Joiner also testified that Texie was "given" fifty percent of the business and was made partner. This evidence permitted the trial court to find that Michael intended to make a gift. The gift was commemorated and delivered by the creation of the Partnership, which listed Texie as a fifty-percent owner. Texie testified to her understanding of the gift and that she believed the Partnership was hers and Michaels. From this testimony, the trial court could have concluded that Texie proved the three elements of a gift of the Partnership interest. The trial court could have also found that, based on the testimony showing that the conversion could have been completed without giving Texie an ownership interest, Michael failed to rebut the presumption of gift. The trial court's conclusion was further strengthened by Texie's inclusion

35

in the Weir transaction and her inclusion on the note payable. As a result, we find no error in the trial court's characterization of the proceeds from the sale of the Partnership.

### b. The Brown Tract

The Company obtained a loan and purchased property known as the Brown tract in 2000 for $35,000.00. Because the Property was owned by the Company, Fejer agreed that it was neither community nor separate property at the time. Even so, as explained above, the Partnership was sold by Michael and Texie to the Weirs. The Brown tract was initially part of the purchase of Nash Trucking but, after the sale of the Partnership to the Weirs, the Partnership sold the Brown tract back and conveyed it to both Michael and Texie.

Michael argues that "the $35,000 purchase price was borrowed by Michael, thus it is his separate property." "[W]hen property is conveyed to an entity . . . , it becomes the property of the entity and loses its separate or community character." *Matter of Marriage of Hudson*, No. 06-18-00011-CV, 2018 WL 4656288, at *3 (Tex. App.—Texarkana Sept. 28, 2018, no pet.) (mem. op.) (citing *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 27 (Tex. App.—San Antonio 2006, pets. denied); *Marshall v. Marshall*, 735 S.W.2d 587, 594 (Tex. App.—Dallas 1987, writ ref'd n.r.e.)). As set out above, even though the Company was Michael's separate property prior to the conversion, the Partnership became owned by both Michael and Texie in accordance with the conversion documents. It is undisputed that the Partnership was sold to the Weirs and that the Brown tract was initially a part of the sale. Because Michael and Texie reacquired the Brown tract by deed after the Weirs sold the property back to them, the Brown tract was acquired after the marriage and was presumptively community property. Based on these facts, and the

36

conversion of the Company and sale of the Partnership, the trial court properly found that Michael did not meet his burden to show that the Brown tract was his separate property.

### 3. The Remaining Properties

#### a. The T&P Federal Credit Union Account

Texie testified that she and Michael used an account at T&P Federal Credit Union (T&P), which she admitted was given to Michael by his grandfather. Beverly Bennett, a T&P employee, testified that the T&P Account was created in 1981 and named Michael and his mother, Molly Piercy, as the original owners. Bennett said that Texie's name was added to the account by at least 2002.

The PMA provided that the parties could "maintain a joint account, identified by the names of the Parties . . . into which they [would] deposit funds from time to time . . . [to] be used to pay household expenses and such other expenses" as they agreed. According to Bennett, Michael would deposit Texie's paychecks from the Partnership into the T&P Account. Bennett produced a statement showing that the balance on the T&P Account in 2002, when the account had both Michael's and Texie's names, was $1,105.10, and that the then-current balance was over $75,000.00. Texie said that she placed a $50,000.00 gift received as her separate property into the T&P Account, but also stated that she used that money to purchase property in Hallsville. Bennett could not determine who made the additional deposits into the T&P Account and testified that there was no evidence of any independent tracing. Also, Texie produced a check made out to the T&P account for $30,000.00 from the parties' joint 761 Account and testified that she believed it was deposited into the T&P Account.

37

The PMA did not list any account at T&P as Michael's separate property.[13] However, he argues that, since the T&P Account was opened prior to the marriage, it was his separate property. Texie argues that, because Michael failed to establish the balance in the T&P Account before marriage, he did not show that the balance at the time of the divorce was traced back to his separate property.

The evidence at trial established that the T&P Account was created before the marriage and belonged to Michael and Piercy, but did not show the balance of the account, if any, before the marriage. There were also no records showing whether the funds in the account had been depleted before it dipped to $1,105.10 in 2002. By at least 2002, Texie testified that she and Michael both used that account during the marriage, which had both parties' names, and proved that she deposited her separate property, including her wages, into the account. The trial court could have found that the T&P Account's use fell in line with the PMA's provision specifying the creation and use of joint community accounts. Texie also opined that community funds from their joint 761 Account were deposited into the T&P Account, which could have supported a finding that the funds were commingled. In such a circumstance, where "community property income ha[s] been commingled with the originally separate principal," we have found that the spouse claiming the property as separate must "trace . . . [the] account and its holdings from the date of divorce back to the date of the marriage." *In re Marriage of Born*, 2009 WL 1010876, at *3 (citing *Cockerham*, 527 S.W.2d at 167). Otherwise, we have found, as we do here, that a trial

_____

[13]Because we construe premarital agreements narrowly, we find the PMA's definition of "separate property" was limited to the list of the parties' separate property in the PMA. Because the T&P Account was not listed as Michael's separate property, we find inapplicable the provision addressing "[t]he commingling by one Party of his or her separate funds or property with the separate funds or property of the other Party."

38

court does not err by determining that the account is community property. *See id.* We overrule Michael's complaint about the T&P Account.

### b.        The Caterpillar 416 Backhoe

The trial court awarded a Caterpillar "416 Backhoe Tractor" to Michael. Because the PMA included a "1996 Backhoe" with an estimated $45,000.00 value as Michael's separate property, Michael argues that the trial court erred by characterizing the Caterpillar "416 Backhoe Tractor" as community property.

Texie argues that nothing shows that the "1996 Backhoe" listed in the PMA was the same backhoe as the one the trial court deemed to be community property. Because premarital agreements are construed "narrowly in favor of the community estate," *Williams*, 246 S.W.3d at 211, and "[a]ny doubt as to the character of property should be resolved in favor of the community estate," *In re Marriage of Moncey*, 404 S.W.3d at 706, we agree with Texie.

The PMA said nothing about the brand or type of the backhoe claimed as Michael's separate property and did not contain a vehicle identification number or any other identifying information. At trial, it was established that the 416 Backhoe Tractor was once an asset of the Company and Partnership, and business records showed that the asset was acquired by the Company on February 26, 1999, after the marriage. As a result, nothing showed that the "416 Backhoe Tractor" was acquired in 1996 or was the same as the "1996 Backhoe" listed in the PMA as Michael's separate property.

More important, the Caterpillar "416 Backhoe Tractor" was specifically identified during the sale of the Partnership as an asset that would be conveyed to both Michael and Texie before

39

closing. From this evidence, the trial court could determine that the "416 Backhoe Tractor" came into Michael and Texie's possession after the marriage, that it was presumptively community property, and that Michael failed to demonstrate that the "416 Backhoe Tractor" was his separate property. We find no error in the trial court's decision to characterize the "416 Backhoe Tractor" as community property.

### c. The Tractors

Between 2010 and 2012, Michael purchased a John Deere 6150R tractor and a 7230 cab tractor and loader. Michael made down payments on both tractors and financed the remaining balances. Because he alone signed the contracts financing the tractors, Michael argues that he rebutted the community presumption.

We begin with the presumption that the tractors were community property because they were acquired after the marriage. Michael did not trace the source of funds used to make the down payments on both tractors, it is presumed that the debt on the tractors was incurred on community credit, and there was no evidence that the lender agreed only to look to Michael's separate property interest in its satisfaction. *See Cockerham*, 527 S.W.2d at 171; *Jones*, 890 S.W.2d at 475. Also, the evidence showed that Michael wrote checks on the 660 Account and the 761 Account to pay his financing obligation on the John Deere 6150R tractor, that payments on the financing obligation for the 7230 cab tractor and loader came from the 127 Account, and that these accounts had been commingled.

40

We find that the trial court did not err in determining that Michael failed to meet his burden to show that the tractors were purchased using separate property funds. As a result, the trial court properly determined that the tractors were community property.

### E.     Summation

We find that the trial court properly characterized thirteen of the fourteen disputed properties as community property and overrule Michael's points of error related to those properties.[14] Even so, we find that the Loop and 59 tract was Michael's separate property because of the separate property recital, which became conclusive due to Texie's participation in the transaction. As a result, we next evaluate whether Michael has shown that he was harmed by this mischaracterization.

## III.    Michael Has Shown Harm

### A.     Standard of Review

"[E]ven if the trial court mischaracterizes property in its division of the marital estate, the error does not require reversal 'unless the mischaracterization would have had more than a *de minimis* effect on the [] court's just and right division of the property.'" *In re Marriage of Moncey*, 404 S.W.3d at 706 (second alteration in original) (quoting *Vandiver v. Vandiver*, 4 S.W.3d 300, 302 (Tex. App.—Corpus Christi 1999, pet. denied)). "The burden to show that a

---

[14]Michael also argues that the trial court should have found that the Loop and 59 tract, Homestead tracts, and Caddo Lake lots were his separate property in ruling on his motion for summary judgment. "It is well settled that where the movant unsuccessfully moves for summary judgment and subsequently loses in a trial on the merits, the order denying the summary judgment cannot be reviewed on appeal." *Reule v. M & T Mortg.*, 483 S.W.3d 600, 612 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (citing *United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *Orozco v. Orozco*, 917 S.W.2d 70 (Tex. App.—San Antonio 1996, writ denied); *Pennington v. Gurkoff*, 899 S.W.2d 767, 769 (Tex. App.—Fort Worth 1995, writ denied); *Nash v. Civil Serv. Comm'n, Palestine*, 864 S.W.2d 163, 165 (Tex. App.—Tyler 1993, no writ)); *see Cincinnati Life Ins. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996). Our resolution of the issues above also moots Michael's complaints.

trial court's error caused a manifestly unjust property division is a high one and, even with adequate briefing, more difficult when the record contains no findings as to the value of the estate assets." *Matter of Marriage of Rangel & Tovias-Rangel*, 580 S.W.3d 675, 683 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Citing to this caselaw, Texie argues that the lack of findings of fact and conclusions of law prevents a finding of harm because "[w]ithout findings of fact, we do not know the basis for the division, the values assigned to the community assets, or the percentage of the marital estate that each party received." *Id.*

Even so, "[r]eversible error exists as a matter of law . . . if the trial court characterizes property as community property and awards it to one spouse when it is established as the separate property of the other spouse." *In re Marriage of Moncey*, 404 S.W.3d at 706 (citing *Eggemeyer*, 554 S.W.2d at 140); *see Vasudevan v. Vasudevan*, No. 14-14-00765-CV, 2015 WL 4774569, at *1 (Tex. App.—Houston [14th Dist.] Aug. 13, 2015, no pet.) (mem. op.) ("On the other hand, if a trial court mischaracterizes separate property as community property, the error is by definition harmful, and we must reverse and remand because the subsequent division of the community estate would divest the spouse of his or her separate property." (citing *Smith v. Smith*, 22 S.W.3d 140, 147 (Tex. App.—Houston [14th Dist.] 2000, no pet.))); *In re Marriage of Case*, 28 S.W.3d 154, 161 (Tex. App.—Texarkana 2000, no pet.) ("When a court mischaracterizes separate property as community property, the error requires reversal because a spouse is divested of separate property." (citing *Eggemeyer*, 554 S.W.2d at 140)). This is the precise situation before us.

The Loop and 59 tract was Michael's separate property, but the trial court awarded it to Texie because of its mischaracterization as community property. Although its value at trial was disputed, it was undisputed that Michael made a down payment of $33,603.65 and executed a promissory note for $195,000.00 when he purchased the property in 2007. Reversible error was established as a matter of law because Michael was divested of his ownership of separate property. In such a circumstance, reversal of the property division is required. *See Case*, 28 S.W.3d at 162; *Smith*, 22 S.W.3d at 153.

## IV.    Conclusion

We sustain Michael's point of error relating to the characterization of the Loop and 59 tract but overrule his other points of error. Because the Loop and 59 tract should have been characterized as Michael's separate property, we reverse the portion of the trial court's order setting forth its property division and remand the matter to the trial court for further proceedings consistent with this opinion. We sever the portion of the trial court's decree granting a divorce to the parties and affirm that portion of the decree. *See Case*, 28 S.W.3d at 162.


Scott E. Stevens
Justice

Date Submitted:    October 27, 2021
Date Decided:     March 4, 2022


43